2016 IL App (1st) 132205

FOURTH DIVISION
March 24, 2016

No. 1-13-2205

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 4247 |
| | ) | |
| MICHAEL PITTS, | ) | Honorable |
| | ) | Arthur F. Hill, |
| Defendant-Appellant. | ) | Neera Walsh, |
| | ) | Judges Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    After police searched his house and found firearms and ammunition, defendant Michael Pitts was charged with unlawful use or possession of weapons by a felon (720 ILCS 5/24-1.1(a) (West 2010)) and possessing a firearm with defaced identification marks (720 ILCS 5/24-5(b) (West 2010)). He moved to suppress the evidence recovered from his home on the basis that the complaint supporting the search warrant for his home was incomplete: the second page of the complaint, which had been signed by the judge issuing the warrant, had gone missing. The trial court denied that motion, after the State presented an unsigned copy of the complaint at the motion-to-suppress hearing. After a bench trial, defendant was convicted of both offenses, based largely on evidence that he told the police that the guns belonged to him.

¶ 2    On appeal, defendant contends that: (1) the State failed to prove the *corpus delicti* of defendant's offenses, because his guilt rested solely on his uncorroborated statements to the police; and (2) the circuit court erred when it failed to quash the warrant to search his house because the

State failed to restore the search warrant, part of which had been lost, under the Court Records Restoration Act (705 ILCS 85/0.01 *et seq.* (West 2010)).

¶ 3    As we explain more fully below, we reject defendant's *corpus delicti* argument. There was sufficient evidence that an offense had been committed to corroborate defendant's confession that the guns in his home belonged to him, including the fact that guns were seized from a bedroom in defendant's home.

¶ 4    We also disagree with defendant's argument that the trial court erred in considering the purported duplicate second page of the complaint. The State was not required to restore the complaint under the Act, because it had what it purported to be a complete copy of the complaint. Thus, the State was simply required to authenticate that copy of the complaint under the rules of evidence. And we conclude that the State sufficiently authenticated the complaint. We affirm defendant's convictions and sentence.

¶ 5                              I. BACKGROUND

¶ 6    The State charged defendant with four counts of unlawful use or possession of a weapon by a felon and one count of defacing identification marks of a firearm. During discovery, the State produced a search warrant signed by Judge Fletcher authorizing the police to search defendant's home for firearms. But the State did not yet have a copy of the complaint for the search warrant signed by Judge Fletcher. A month later, the State still had not found the signed complaint, but it told the court that two of the police officers who executed the warrant were searching for the signed complaint.

¶ 7    Approximately 10 weeks later, the State told the court that there were actually two separate search warrants for the case: one that was not executed, which had been tendered to defendant, and one that was executed, which the State had not tendered to defendant because it could not locate

the "entire signed copy." Eventually, the State was able to locate the executed search warrant and the first page of the complaint supporting the warrant signed by Judge Fletcher, but could not locate the second page of the complaint signed by Judge Fletcher.

¶ 8    The unsigned copy of the complaint—the one that the State had given to defendant—included a handwritten legend in the left-hand margin containing an assistant State's Attorney's signed name, the warrant number, a date, and a time. The copy of both the search warrant and first page of the complaint signed by Judge Fletcher contained the same handwritten legend in the same location. The State never found the second page of the complaint that was purportedly signed by Judge Fletcher.

¶ 9    The first page of the complaint alleged that Officer Napoli of the Chicago police department spoke with a registered confidential informant, who told Napoli that he saw defendant in possession of a "black 9mm semi-auto handgun" in defendant's bedroom. This informant had provided Napoli accurate information four times over a five-month period, and the informant was a "reliable source of information concerning firearms." The second page of the unsigned complaint alleged that defendant had been convicted of arson in 1995. It also alleged that Napoli had corroborated defendant's address by observing defendant at the address given to Napoli by the informant. The search warrant authorized the search of defendant's home to seize the handgun, any ammunition, and any other contraband which would constitute the crime of unlawful use or possession of a weapon by a felon.

¶ 10    On June 12, 2012, defendant filed a motion to quash the search warrant and suppress the evidence the police obtained in their search of his home. The suppression hearing was heard by a different judge than Judge Hill, who presided over the trial. At that suppression hearing, defense counsel argued that, because the second page of the complaint was not signed by Judge Fletcher,

the circuit court should not consider that page in determining if there was probable cause to support the search warrant. Defense counsel argued that, when the court considered only the first page of the complaint, it lacked the requisite probable cause to support the issuance of a search warrant. In response to defense counsel's argument regarding the unsigned second page of the complaint, the court stated:

"Let me tell you why I say that's part of the package.

* * *

If we look at the first page of—the search warrant, the actual search warrant and on the left hand margin there is the approval. We all know the State[']s Attorney's Office goes through an approval process. Anyone who wants a search warrant has to take that to the police—to the State[']s Attorney's Office, excuse me, for approval.

The way the State's Attorney indicates [its] approval to the judge on a search warrant is to write in the left hand margin the name of the Assistant State's Attorney who approved the search warrant, give it a search warrant number, give it a date, and give it a time.

This one looks like Assistant State's Attorney – I don't [know] if that's Shawn or Leon O'Callaghan.

MR. BOERSMA [Assistant State's Attorney]: Shawn O'Callaghan.

THE COURT: Shawn O'Callaghan. The search warrant number is 11SW4679 and gives a date of 2/17/11 at 2150 hours. That legend is consistent, same signature with the same search warrant number, same date, and same time on all three pages.

So as the Court looked at this I considered this as one entire document.

* * *

So the different pages in the document, at least in the Court's mind, are bound together by that legend on the left hand margin.

So this isn't the best circumstances of the execution of a search warrant, but this Court finds that looking at the totality of this document it's not fatal as it relates to the effectiveness of this search warrant, and it includes—if we gather in that last page of the complaint that last sentence of the first full paragraph that it establishes a crime."

The court subsequently denied defendant's motion, and the case proceeded to trial.

¶ 11    At trial, Officer Bonnstetter of the Chicago police department testified that, at approximately 9:30 p.m. on February 18, 2011, he was part of a team of 10 to 14 officers executing a search warrant at a house located on the 4700 block of West Van Buren Street. When the team arrived at the house, Officer Napoli knocked on the door, but no one answered. Another officer knocked down the door, and officers entered the house.

¶ 12    Bonnstetter described the layout of the house. On the first floor, there was a living room inside the front door, a dining room and a bedroom in the middle of the house, and a bedroom in the rear. Bonnstetter searched the dining room of the house and found an envelope with a Visa credit card inside and a voter registration card. The name on the envelope was "Michael L. Pitts Sr.," and the name on the voter registration card was "Michael Pitts." Both items listed the address of the house subject to the search warrant.

¶ 13    Officer Napoli detained defendant in the dining room. Napoli asked defendant "if he had anything illegal on him" and "where his bedroom was located." Defendant responded that his room was in the "back" of the house. Napoli then performed a protective pat down of defendant, recovered his wallet, and placed the wallet on the dining room table. On cross-examination, Napoli admitted that he did not write down in his police report that defendant told him his bedroom was in

the "back" of the house.

¶ 14    Bonnstetter found two forms of identification inside defendant's wallet: an Illinois commercial driver's license and a State identification card. Both the commercial driver's license and the ID card listed the name "Michael L. Pitts" and the address of the house subject to the search warrant. On cross-examination, Bonnstetter admitted that the rear bedroom on the first floor did not contain any proof of residency.

¶ 15    Officer Behrend testified that he searched the rear bedroom on the first floor along with Officer Frano. Underneath the bed, Behrend found a 12-gauge shotgun. In one of the dressers, he found live shotgun shells and what he believed to be male clothing. Frano also found a loaded, blue steel semi-automatic handgun on the top shelf of a closet. On cross-examination, Behrend acknowledged that he never saw defendant in the rear bedroom, and he did not find any proof of residency in the rear bedroom.

¶ 16    Officer Simon searched the basement. There, he saw a small bathroom on one side of the hallway and a bedroom on the other side. The bedroom had a bed and a television with "an X-box or something." Simon saw defendant's son, Michael Pitts, Jr. (Michael Jr.), in the bathroom, wearing only a towel. After Michael Jr. got dressed, the officers escorted him upstairs.

¶ 17    Later, Frano and Behrend informed Simon that they found evidence in the rear bedroom of the first floor, including the shotgun, shotgun shells, and handgun. Simon noticed that the handgun's serial number had been scratched off. On cross-examination, Simon admitted that he did not know who scratched the serial number off of the handgun.

¶ 18    After the search, defendant was arrested and transported to the police station. There, Napoli advised defendant of his rights and asked him about the guns found in the home. Napoli testified that defendant said, "I know the guns were mine" and "I've had have [*sic*] them for a long

time." Defendant told Napoli that his son lived with him, but Napoli did not speak to Michael Jr. On cross-examination, Napoli acknowledged that defendant neither described the guns nor said whether they were loaded.

¶ 19     The State introduced into evidence a certified copy of defendant's prior felony conviction for arson and rested its case.

¶ 20     Michael Jr. testified that he lived with his father. He said that the rear bedroom was his. Defendant stayed in the bedroom in the basement of the house. In court, Michael Jr. admitted that the shotgun, handgun, and ammunition that the police found in the rear bedroom belonged to him.

¶ 21     Michael Jr. testified that defendant's birthday was February 16. On February 18, 2011, defendant planned to host a birthday party with family and friends. Because defendant was cleaning up the first floor of the house in anticipation of the party, Michael Jr. had to shower in the basement bathroom the night of February 18, 2011. As Michael Jr. finished his shower, he heard a knock on the bathroom door by a police officer. He put a towel on, opened the bathroom door and saw several officers. The officers allowed Michael Jr. to dress before bringing him upstairs. Michael Jr. testified that he had brought clothes with him downstairs and put them right outside the bathroom on a bar stool, so the officers gave him what he had brought downstairs. On cross-examination, he denied that his clothes were actually in the bedroom just across the hall from the bathroom.

¶ 22     Michael Jr. maintained that defendant resided in the basement even though the basement and its bedroom had photographs of dogs playing pool, women in bikinis, as well as other signs and photographs depicting alcohol consumption. He acknowledged that his bedroom in the rear on the first floor was nicer and less messy than the basement bedroom.

¶ 23     Defendant testified that his bedroom was in the basement of the house while Michael Jr.'s

was the rear bedroom on the first floor. Defendant agreed that the rear bedroom was nicer than the basement bedroom, but he had always lived in the basement because the rear bedroom used to belong to his parents until they passed away. When they passed away, defendant remained in the basement.

¶ 24    At approximately 9:30 p.m. on February 18, 2011, defendant was cleaning the house, including the first-floor bathroom, in anticipation of his birthday party later that evening. While defendant was cooking for the party, he heard glass break toward the front of his house. He walked toward the front, opened the door, and saw multiple police officers. Two of the officers tackled and handcuffed him. The officers then took defendant to the dining room where he remained for some time.

¶ 25    On cross-examination, defendant denied telling an officer that the rear bedroom was his or that the guns were his. In fact, he said he told the officer that the guns were not his.

¶ 26    The court found defendant guilty of all five charges, stating the "biggest and most powerful piece of evidence" was the testimony of Napoli, who stated that defendant admitted to owning the guns found in the rear bedroom "for a long time." The court was "not bothered" that defendant's statement to Napoli did not have more "specificity." Meanwhile, the court found defendant's son's testimony "a little incredible" in that he would be taking a shower downstairs if his bedroom was upstairs. Moreover, the court found defendant to be "refined," "cogent," and "intelligent," and the photographs in the bedroom and basement did "not go with [defendant]" but rather with his son. The court merged the five guilty charges into one conviction for unlawful use or possession of a weapon by a felon and subsequently sentenced defendant to three years in prison. This appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28                                    A. *Corpus Delicti*

¶ 29    Defendant first contends that the State failed to prove the *corpus delicti* of his offenses because his convictions rested solely on his uncorroborated statements to the police. Specifically, defendant argues that the State presented no evidence connecting defendant to the rear bedroom where the weapons were found, defendant was never seen in the rear bedroom by police officers, and there was no physical evidence connecting him to the weapons. The State counters that defendant's ownership of, and residence in, the apartment, along with the other evidence presented at trial, sufficiently corroborated his confession.

¶ 30    A defendant may not be convicted of a crime unless each element constituting that crime is proven beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004); *In re Winship*, 397 U.S. 358, 364 (1970). When assessing the sufficiency of the evidence in a criminal case, the reviewing court must view the evidence in the light most favorable to the State and then decide if any rational trier of fact could find all the elements of the crime proven beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31. All reasonable inferences must be drawn in favor of the State. *Id*.

¶ 31    When proving each element of a criminal offense beyond a reasonable doubt, the State must prove beyond a reasonable doubt that (1) a crime occurred, known as the *corpus delicti*, and (2) the crime was committed by the defendant. *People v. Sargent*, 239 Ill. 2d 166, 183 (2010). A defendant's out-of-court confession alone cannot prove the *corpus delicti*. *People v. Lara*, 2012 IL 112370, ¶ 17. A defendant's extrajudicial confession must also be accompanied by "independent corroborating evidence." *Id.* The corroborating evidence itself need not prove the defendant guilty of the crime beyond a reasonable doubt, but the evidence must " 'tend[ ] to connect the defendant with the crime.' " (Emphasis omitted.) *Id.* ¶ 32 (quoting *People v. Perfecto*, 26 Ill. 2d 228, 229

(1962)). The corroborating facts are viewed in the light most favorable to the State. *People v. Hannah*, 2013 IL App (1st) 111660, ¶ 27.

¶ 32    We find *People v. Smith*, 2015 IL App (1st) 132176, instructive in this case. In *Smith*, a Greyhound bus driver noticed the defendant sitting in the last row of the bus. *Id.* ¶ 4. After the bus arrived in Chicago and all the passengers had exited, the driver conducted a posttrip sweep of the bus to make sure all the passengers had taken their belongings. *Id.* ¶ 5. On the last aisle seat of the passenger side of the bus, the driver noticed a backpack that was unzipped and saw inside what he believed to be the butt of a handgun. *Id.* Because he believed the backpack held a weapon, the driver took the backpack, exited the bus and began walking to give the backpack to his supervisor. *Id.* The defendant approached the driver and told the driver the backpack belonged to him. *Id.* The defendant admitted that he had a BB gun in the backpack, but the driver told the defendant that he had to turn the backpack over to his supervisor because the gun looked real. *Id.* A Greyhound security officer, who was also an off-duty police officer, inspected the weapon and determined it was a real gun. *Id.* ¶ 7. The security guard approached the defendant, arrested him and waited for on-duty officers to arrive. *Id.* The defendant was charged with, and convicted of, aggravated unlawful use of a weapon. *Id.* ¶¶ 1, 3.

¶ 33    This court rejected the defendant's argument that the State failed to prove the *corpus delicti* of the offense because the only evidence of his guilt was his admission to the bus driver that the backpack belonged to him. *Id.* ¶¶ 17, 19. Instead, it concluded that both the security guard and the bus driver's testimony "established the existence of a gun on the bus." *Id.* ¶ 19. Additionally, the driver's testimony that "he observed [the defendant] sit in the last seat on the bus, which was the same area where he personally found the bag with the gun," connected the defendant to the

offense. *Id.* Together, these facts were "independent evidence tending to inspire belief in [the defendant's] admission that he owned the bag containing the gun that was found on the bus." *Id*.

¶ 34    In the present case, viewing the testimony of officers Bonnstetter, Simon and Behrend in the light most favorable to the State, there was sufficient corroborating evidence to prove the *corpus delicti* of both offenses. Both Simon and Behrend's testimony demonstrated the existence of guns and ammunition in the rear bedroom. Additionally, Bonnstetter testified that he saw three items that contained defendant's name and the address where the warrant was being executed: an envelope with a Visa credit card, an Illinois commercial driver's license and an ID card. (The fourth item, the voter registration card, did not distinguish between defendant and his son, Michael Jr.) Similar to *Smith*, where the defendant was seen in the area near where a gun was found, the proof of defendant's residence showed that he lived at the house where the guns and ammunition were found. While this evidence alone would not prove that defendant possessed the firearms, they tended to connect defendant with the offenses, which is all that is required to prove the *corpus delicti* of the offenses. See *Lara*, 2012 IL 112370, ¶ 32. Accordingly, there was sufficient independent evidence beyond defendant's confession to prove the *corpus delicti* of the both offenses.

¶ 35    Defendant relies on *Hannah*, 2013 IL App (1st) 111660, and *People v. Harris*, 2012 IL App (1st) 100077, to support his argument that the State failed to prove the *corpus delicti* of his offenses. We do not find defendant's arguments persuasive.

¶ 36    In *Hannah*, while police officers were executing a search warrant, they found the defendant, a woman, and a child sitting on a bed in the only bedroom of an apartment. *Hannah*, 2013 IL App (1st) 111660, ¶ 29. During the search, one of the officers recovered a gun between two mattresses on the bed. *Id.* Consequently, both the defendant and the woman were handcuffed

and brought to the living room. *Id.* While there, the defendant admitted to owning the handgun found in the bedroom. *Id.* On appeal, the defendant argued that beyond his incriminating statement, there was no other corroborating evidence to prove he owned the handgun. *Id.* ¶ 22. The court held that while the defendant could not be said to have "exclusive" control over the gun because both he and the woman were sitting on the bed, the facts demonstrate that the defendant had "immediate" control over the area where the gun was recovered. (Emphases omitted.) *Id.* ¶ 29. Accordingly, the court determined that this fact tended to show that the defendant, who had a prior felony, unlawfully possessed the weapon. *Id.*

¶ 37    Distinguishing his case from *Hannah*, defendant argues there was no evidence to show that he "had ever even been into the room where the guns were found and the officer who searched that room testified that he found nothing linking the room to [defendant]." While we acknowledge that the corroborating evidence in this case is not as strong as the corroborating evidence in *Hannah*, we reiterate that the evidence corroborating defendant's confession does not need to be particularly compelling or strong. See *Lara*, 2012 IL 112370, ¶ 18 ("To avoid running afoul of the *corpus delicti* rule, the independent evidence need only *tend to show* the commission of a crime. It need not be so strong that it alone proves the commission of the charged offense beyond a reasonable doubt." (Emphasis in original.)). Here, the evidence showed that defendant, a felon, lived in the home where guns were found. Although it did not prove that defendant possessed the firearms, it was enough to *tend* to show that he possessed the firearms. That was all the corroboration the *corpus delicti* rule required.

¶ 38    Nor does *Harris* support defendant's position. In *Harris*, the defendant was charged with possessing a firearm in a public street. *Harris*, 2012 IL App (1st) 100077, ¶ 20. The police ultimately found a gun in the defendant's car. *Id.* ¶ 8. The only evidence that the defendant had it in

the street was his confession and the statement of an anonymous witness. *Id.* ¶¶ 7-8. The court held that the anonymous witness's hearsay statement could not corroborate the defendant's statement. *Id.* ¶ 21. Thus, *Harris* stands for the proposition that a hearsay statement may not be the necessary corroborating evidence to support the *corpus delicti* of an offense. See *id.* ¶ 26. In the present case, the corroborating evidence was not inadmissible hearsay. Police officers found firearms, including one with a scratched-off serial number, in a bedroom of defendant's home. This evidence was enough to corroborate defendant's admission that he owned the firearms.

¶ 39                    B. Missing Complaint for Search Warrant

¶ 40    Next, defendant contends that the circuit court erred when it failed to quash the warrant to search his house and suppress the firearms found during the search. As a reminder, the State produced in discovery a search warrant signed by the judge and the first page of a complaint signed by the assistant State's Attorney and the judge. The State could not locate a signed copy of the second page of the complaint but produced in discovery an unsigned second page—that is, a page that did contain the assistant State's Attorney's signature and legend but not the judge's signature.

¶ 41    On a motion to suppress, the defendant bears the initial burden to prove the unlawfulness of the search and seizure. *People v. McQuown*, 407 Ill. App. 3d 1138, 1143 (2011). If the defendant makes a *prima facie* showing that the search and seizure were unlawful, "the burden shifts to the State to produce evidence justifying the intrusion." *People v. Ortiz*, 317 Ill. App. 3d 212, 220 (2000).

¶ 42    We review a circuit court's decision concerning a motion to quash a search warrant and suppress the evidence on a bifurcated standard of review. *People v. Brown*, 2015 IL App (1st) 140093, ¶ 12. We defer to the court's findings of fact and will reverse only if they are against the manifest weight of the evidence. *Id.* Findings of fact are against the manifest weight of the

evidence when they are "unreasonable, arbitrary, or not based on the evidence presented." *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). We review the ultimate decision to deny or grant the motion to suppress *de novo*. *Brown*, 2015 IL App (1st) 140093, ¶ 12.

¶ 43    We must first address whether the trial court properly considered what it determined to be the second page of the complaint for search warrant. Generally, when a defendant challenges the probable cause underlying the issuance of a search warrant or the search warrant itself, the warrant or complaint for search warrant is produced. See, *e.g.*, *People v. Brown*, 2014 IL App (2d) 121167, ¶¶ 11-15; *People v. Lenyoun*, 402 Ill. App. 3d 787, 789-90 (2010). It is undisputed that the State failed to produce the original second page of the complaint for search warrant.

¶ 44    Defendant argues that the court should not have considered the purported duplicate second page of the complaint, and that without the information contained in that second page—namely, the fact that defendant had a prior felony conviction—the complaint did not establish probable cause for the offense of unlawful use of a weapon by a felon. Defendant thus argues for suppression. The State, while acknowledging that it failed to produce the original second page of the complaint, claims that the trial court properly considered the second page of a duplicate version of the complaint as if it were part of the signed complaint.

¶ 45    Defendant relies on the Court Records Restoration Act (at times, the Act) (705 ILCS 85/1 *et seq.* (West 2010)), and our supreme court's decision in *People v. Wells*, 182 Ill. 2d 471 (1998), for his position that the State was required to satisfy the dictates of the Act if it wanted to restore the missing page two of the complaint for search warrant. That Act governs the loss or destruction "of any judgment or order, or other proceeding, of any judicial court of this State, or any part of the record of any judicial proceeding." 705 ILCS 85/1 (West 2010). Section 2 of the Act provides in relevant part:

- 14 -

"That whenever the loss or destruction of any such record or part thereof shall have happened, or shall hereafter happen, *** any party or person interested therein may make a written application to the court to which such record belonged, verified by affidavit or affidavits, showing the loss or destruction thereof, and that certified copies thereof cannot be obtained by the party or person making such application, and the substance of the record so lost or destroyed, and that such loss or destruction occurred, without the fault or neglect of the party or person making such application, and that the loss or destruction of such record, unless supplied, will or may result in damage to the party or person making such application; and thereupon, said court shall cause said application to be entered of record in said court, and due notice of said application shall be given, as in civil cases, that said application will be heard by said court. And if, upon such hearing, said court shall be satisfied that the statements contained in said written application are true, said court shall make an order, reciting what was the substance and effect of said lost or destroyed record; which order shall be entered of record in said court, and have the same effect which said original record would have had if the same had not been lost or destroyed, so far as concerns the party or person making such application, and the persons who shall have been notified, as provided for in this section." 705 ILCS 85/2 (West 2010).

¶ 46    It is undisputed that, in this case, the State did not comply with the Act; it made no attempt to restore the missing document in a fashion prescribed by the Act. But according to the State, it was not required to comply with the formalities of the Act in order to defeat defendant's motion to suppress.

¶ 47    In order to determine whether the State was required to comply with section 2 of the Act, we turn to our supreme court's decision in *Wells*, 182 Ill. 2d 471. In that case, the defendant was

charged with a murder 25 years after its commission. *Id.* at 473. His house had been searched at the time of the murder, in 1967, allegedly pursuant to a valid search warrant, but at the time of his prosecution in 1992, the State could not locate the original warrant, complaint for search warrant, or return of warrant, nor could it produce a purported copy of any of those documents. *Id.* at 474.[1]

¶ 48 The defendant filed a motion to suppress evidence the police found in his home in 1967, claiming that the State could not prove that a valid warrant ever existed to authorize that search. *Id.* In response, the State filed an application to restore the warrant, and the supporting complaint, pursuant to section 2 of the Act. *Id.* At a hearing, the trial court heard testimony that no one in the police department could locate a copy of the warrant. *Id.* at 476. The officer who had allegedly obtained the warrant testified that he presented an affidavit in support of the warrant, and that the warrant permitted the officer to search the defendant's home for a handgun and clothing. *Id.* at 477-78. The trial court granted the motion to suppress and denied the State's petition to restore the warrant, finding that the testimony it heard was insufficiently reliable to support a finding that a warrant had been issued. *Id.* at 479.[2]

¶ 49 Before the supreme court, the defendant argued in support of the trial court's findings but, more relevant to the case before us, also argued for a bright-line rule that, " 'for a search to be justified by a warrant, the State must produce that warrant or a reliable copy of that warrant.' " *Id.*

---

[1] For the sake of clarity, the State in *Wells* did initially produce a purported copy of a complaint during the 1992 suppression hearing, but during that hearing, the officer who testified that he had presented the judge with the complaint for search warrant in 1967 stated that he "had no idea who prepared" that purported copy, and he "could not be sure that he signed a complaint for a warrant or that [the document tendered by the State] was the document he signed" before the judge. *Wells*, 182 Ill. 2d at 477.

[2] In *Wells*, the trial court actually granted the motion to suppress twice. The first time, the trial court granted the motion to suppress, and the appellate court reversed that order. *Wells*, 182 Ill. 2d at 475-76. On remand, the trial court again granted the motion to suppress, and that order was ultimately taken up to the Illinois Supreme Court. *Id.* at 479. We only address the proceedings that occurred after the first remand, as they are the only facts necessary for our analysis of *Wells*.

at 486-87. The supreme court, though it upheld the trial court's findings and its suppression order (*id*. at 486), refused to adopt a bright-line rule requiring the State to produce a warrant—or a reliable copy thereof—in any case where a defendant challenged the existence of a warrant. *Id*. at 487. The supreme court "decline[d] to write such a rule because it would frustrate an Illinois statute that allows a circuit court to restore court documents under certain circumstances," namely the Court Records Restoration Act. *Id*. The court held that "the breadth of the Act furnishes the means to seek restoration of a search warrant" (*id.* at 488), and that section 2 of the Act "permits a party to seek a declaration from the court as to whether a record existed and if so what the substance of it was." *Id*. at 487. The court also found that the "several explicit evidentiary requirements" in section 2 of the Act sufficiently protected a defendant's rights, as the Act requires a written petition and supporting affidavit, followed by an evidentiary hearing, in all of which the State must demonstrate (1) that the warrant was lost or destroyed; (2) that certified copies are not available; (3) the substantive content of the warrant; (4) that the loss was not due to the fault or neglect of the State; and (5) that prejudice will result if the warrant is not restored. *Id*. at 488; see 705 ILCS 85/2 (West 2010).

¶ 50    Defendant claims that the Act, with its "several explicit evidentiary requirements" (*Wells*, 182 Ill. 2d at 488), was the exclusive means by which the missing page of the complaint for search warrant could have been restored. The State claims that it was not required to comply with the specific dictates of the Act, that it could prove the existence of the missing page two through other evidence. The State also argues that even *Wells* itself noted that the court's power to restore or substitute lost court documents is an inherent power of the court, independent of the Act (see *id.* at 487), and thus the Act could not possibly be the exclusive manner by which this document could be rehabilitated.

¶ 51    We hold that the State was not required to comply with the dictates of the Act.

¶ 52    First, we do not believe that the concept of restoration is even applicable to this case. Neither the State nor defendant used that terminology below. In the trial court, the State did not ask to "restore" page two of the complaint but simply offered what it claimed was a reliable copy of page two to prove its existence and contents—to prove that the second page of the complaint did, in fact, exist and that its contents established probable cause. Where, precisely, the line is drawn between formally "restoring" an original court document, as opposed to merely proving the contents of that original document through secondary evidence, requires a review of the Act and relevant case law.

¶ 53    What is now known as the Court Records Restoration Act was originally passed in March 1872, only months after the Great Chicago Fire in October 1871, and was known as the "Burnt Records Act." *Beveridge v. Chetlain*, 1 Ill. App. 231, 234 (1878). The law provided for an immediate effective date "by reason of the recent destruction by fire of the records of the courts of Cook County." 1871 Ill. Laws 651 (§ 5). In some instances, no doubt, entire court records were destroyed by that fire. See, *e.g.*, *Beveridge*, 1 Ill. App. at 233 (entire court file destroyed while plaintiff's suit for false imprisonment was pending).

¶ 54    Section 2 of the Act, which has barely changed since its enactment in 1872, was a comprehensive response to ensure that a party to any litigation, currently pending or completed, could seek restoration of any court document to protect its interests. The Act, both then and now, contains no limitation on court records subject to restoration. The lost court record could be "an initial pleading, or an appearance, or an entire record." *In re Estate of Bird*, 410 Ill. 390, 399 (1951). The relief of restoration, both then and now, is "an order, reciting what was the substance and effect of said lost or destroyed record; which order shall be entered of record in said court, and

have the same effect which said original record would have had if the same had not been lost or destroyed." 705 ILCS 85/2 (West 2010).

¶ 55    Thus, the purpose of "restoration," at least so far as the Act is concerned, is to physically enter into the public court record, in lieu of an original court document, a court order memorializing the existence and substance of that original document. Once entered, that order of restoration thereafter has "the same effect which said original record would have had if the same had not been lost or destroyed." *Id*. The need for that order could be immediate, as where a plaintiff needed to prove the existence and content of his complaint before proceeding to trial (see *Beveridge*, 1 Ill. App. at 233) or prove that a probate claim had been timely filed, though now missing (see *Estate of Bird*, 410 Ill. at 399). Or a party might need that remedy years later, be it to prove that a sale of a minor's real property had taken place with the court's approval years earlier (see *Hickey v. Hickey*, 295 Ill. App. 67, 69 (1938)) or to prove that a search warrant had been issued 25 years ago (see *Wells*, 182 Ill. 2d at 471).

¶ 56    But the State, before the trial court, made no attempt to "restore" the missing page two of the complaint for search warrant. It did not ask that a court order be placed into the court file, in lieu of the missing original page two, memorializing the existence and content of page two. It merely submitted what it claimed was a reliable duplicate of the missing page two, in the hope that the trial court would agree and deny the motion to suppress. The case law suggests that the concept of restoration under the Act is different than the more garden-variety task of proving the existence of a document, even a court document, through secondary evidence, as the State did here.

¶ 57    For example, in *Beveridge*, 1 Ill. App. at 233, the plaintiff sued the defendant for false imprisonment and swore out a writ to have the defendant taken into custody and held to bail. The defendant, after being arrested, executed a bail bond to the sheriff, with an individual acting as his

surety, whereupon the defendant was released from custody. *Id*. While the suit was pending, the Great Chicago Fire destroyed the entire court file. *Id*. The plaintiff filed a petition, pursuant to the Burnt Records Act, for formal restoration of selected portions of the record—specifically, the initial complaint and supporting affidavit. *Id*. Plaintiff succeeded in obtaining restoration of those documents and ultimately prevailed at trial, obtaining a money judgment against the defendant. *Id*. The plaintiff then filed a writ of execution to levy judgment against the defendant that was returned without satisfaction. *Id*. at 233-34. The plaintiff then filed a writ to return the defendant to custody until satisfaction of the judgment, but that writ was likewise returned unsatisfied when the sheriff could not locate the defendant. *Id*. at 234.

¶ 58    During these proceedings, the surety on the defendant's bond died. *Id*. After the last writ against the defendant was returned without satisfaction, a claim was filed against the surety's estate, seeking to enforce the surety's liability on the defendant's bond. *Id*. At trial, the claimant admitted evidence of the previously restored complaint and affidavit. *Id*. The claimant also admitted secondary evidence of several documents that had been destroyed but *not* formally restored—the original writ to take the defendant into custody, the endorsements thereon, and the bail bond. *Id*. Ultimately, the trial court ruled against the claimant and in favor of the estate. *Id*.

¶ 59    On appeal, the estate argued, in support of the judgment below, that the claimant should not have been allowed to introduce evidence of the original writ or the bail bond, because they had not been formally restored pursuant to the Burnt Records Act, as had the complaint and supporting affidavit. *Id*. This court firmly rejected that argument, holding that secondary evidence was sufficient to prove the contents of documents that had not been formally restored:

> "So far as secondary evidence was admitted to prove the contents of the portions of the record not restored, we think the ruling of the Court below was undoubtedly correct.

The relief of which parties may avail themselves under the provisions of the Burnt Records Act is not exclusive, but is merely cumulative upon the rights and remedies existing independently of its provisions. It has always been held that where a judicial record or other paper is shown to be lost or destroyed, resort may be had to secondary evidence to prove its contents. Records are deemed, in law, to be still in existence and binding upon the parties whose rights are affected thereby, although, in point of fact, they may have been destroyed. A judgment of a court *** loses none of its vitality upon destruction of the writing, which is the primary evidence of its existence. *** The [original writ] and bond having been destroyed, appellant was entitled to avail himself of their provisions by means of secondary evidence notwithstanding the restoration of other portions of the record under the provisions of the act." *Id*. at 234-35.

¶ 60    Our supreme court considered a similar issue, and reached the same conclusion, in *People ex rel. Mohlenbrock v. Pike*, 197 Ill. 449 (1902). That case involved a *quo warranto* action challenging the validity of a town's incorporation. *Id*. at 450. The original papers presented to the county judge in support of incorporation—the petition to incorporate and related documents—were lost, and no contemporaneous record of them could be found. *Id*. at 451. More than 20 years later, in the *quo warranto* action, the court allowed the town to present secondary evidence of the content of the petition to incorporate. *Id*. The court ultimately ruled in favor of the town. *Id*.

¶ 61    On appeal, the relators argued that the contents of the petition were improperly considered because the petition was not restored under the Burnt Records Act, but our supreme court rejected that position, holding that "parol evidence may be resorted to to prove [the petition's] contents" without resort to the Burnt Records Act. *Id*. at 455. The court then reiterated the holding in

*Beveridge* that "[t]he provisions of the Burnt Records Act are not exclusive, but merely cumulative upon the rights and remedies existing independently of its provisions, and records are to be deemed in law to be still existing and binding upon the parties whose rights are affected thereby, although, in point of fact, they have been destroyed." *Id.* at 456.

¶ 62    Indeed, in a case decided before the enactment of the Burnt Records Act, our supreme court wrote, in approving the trial court's substitution of a lost pleading with a copy: "Where papers are lost, no rule of practice is more familiar than to permit them to be supplied by copy. If such a power did not exist in courts, justice would be greatly delayed, if not altogether defeated, in many cases." *Hartford Fire Insurance Co. v. Vanduzor*, 49 Ill. 489, 492 (1869).

¶ 63    We read these cases as drawing a distinction between a formal restoration of a document under the Act and merely proving the contents of that document through a purported copy. In both *Beveridge* and *Pike*, the courts specifically noted that the lost court documents had *not* been restored, yet each case approved of the use of secondary evidence to prove the lost document's contents. And as the supreme court noted in *Vanduzor*, proving the existence and contents of a document through a reliable copy has never been controversial or unusual, even at the time the Act was first enacted in 1872.

¶ 64    We find further support for our position in a statute not cited by the parties, but which speaks more specifically than the Act to what the State attempted to accomplish below. Section 8-1206 of the Code of Civil Procedure (735 ILCS 5/8-1206 (West 2010)) provides that the authenticity of court records "may be proved by *copies* examined and sworn to by credible witnesses." (Emphasis added.) Thus, under section 8-1206, if a copy of a court record is available, it may be used to prove the contents of a court record by examination of the copy and sworn testimony by a credible witness; it does not require formal restoration under the Act.

¶ 65    This court has previously applied section 8-1206 in a case where the State produced a copy of a lost search warrant. In *People v. White*, 19 Ill. App. 3d 750, 751 (1974), the State could not produce an original search warrant at the hearing on the defendant's motion to suppress because "the original warrant was not in the court file and *** could not be found." Instead, the State presented the testimony of the officer who executed the search warrant, who "testified that [a] copy of the warrant tendered to the court and to defense counsel was a true and correct copy of the original warrant." *Id.* This court, citing the predecessor statute to section 8-1206 (Ill. Rev. Stat. 1973, ch. 51, ¶¶ 13, 18), noted that "[p]roof of court records *** may be by copy of the document examined and sworn to by a credible witness." *White*, 19 Ill. App. 3d at 751. The court thus reversed the trial court and held that the State had laid a sufficient foundation for the copy of the search warrant to be admitted into evidence. *Id*.

¶ 66    Reading section 8-1206 together with section 2 of the Court Records Restoration Act, we believe that section 8-1206 is the more applicable statute to the facts of this case. Each statute concerns court records, the original of which is lost, and each statute has been interpreted to include warrants filed with the court. See *id*.; *Wells*, 182 Ill. 2d at 488. But while the Court Records Restoration Act contains "several explicit evidentiary requirements" (*Wells*, 182 Ill. 2d at 488), it is not, itself, a rule of evidence. The act of restoration is not the receipt of a document into evidence. As we have explained, the act of restoration, at least under the Act, is the entry of an order into the record, formally memorializing the existence and content of a lost record so that the original document, though lost or destroyed, will continue in force and effect.

¶ 67    Section 8-1206, on the other hand, *is* a statutory rule of evidence. The plain language of the law makes that abundantly clear, and it is included within article 8 of the Code of Civil Procedure, entitled "Evidence." 735 ILCS 5/art. VIII (West 2010). And section 8-1206 more accurately

describes what the State did below in response to defendant's motion to suppress: it did not ask for entry of an order to formally memorialize the existence and content of page two in the court file but, rather, merely tried to prove the existence and content of page two through a purported copy in response to a motion to suppress.

¶ 68    To be clear, by no means do we suggest that the State would have been *foreclosed* from seeking restoration of page two of the complaint, or that doing so would not have provided *one* appropriate avenue for proving the existence and content of the original page two. We only hold that restoration was not the *only* avenue available where, as here, the State attempted to prove the existence and content of the original page two through a purported copy.

¶ 69    Our holding is consistent with *Wells*. The State made the decision in that case to seek restoration of the lost search warrant and complaint for search warrant. *Wells*, 182 Ill. 2d at 474. The supreme court was not presented with the question of whether any other avenue might have been available to the State. Nor was it asked to consider whether section 8-1206 might be applicable, as the State did not have a purported copy of the search warrant and, though it made some attempt to produce a duplicate of the complaint for search warrant, the testifying police disavowed any knowledge of that purported copy. *Id.* at 474, 477.

¶ 70    Having determined that section 2 of the Act does not govern this case, we must now determine whether the State properly authenticated the purported copy of the second page of the complaint at the hearing on the motion to suppress. Clearly, under section 8-1206 alone, the State failed to authenticate the second page, because it presented no live testimony regarding the authenticity of the copy. See 735 ILCS 5/8-1206 (West 2010) (existence of court records "may be proved by copies examined and sworn to by credible witnesses"); *Cicero Trust & Savings Bank v. Schermann*, 252 Ill. App. 449, 455 (1929) (under section 8-1206, party may authenticate court

record "only on the production of a witness, present in court and subject to examination"). Instead, it simply relied on the face of the purported second page of the complaint, which the trial court compared to the first page and to the warrant itself.

¶ 71 But under the Illinois Rules of Evidence, sworn testimony is not the only way to authenticate a document. Instead, the rules provide that a document may be authenticated in numerous ways, including by witness testimony (Ill. R. Evid. 901(b)(1) (eff. Jan. 1, 2011)), by the trier of fact comparing the document to other authenticated documents (Ill. R. Evid. 901(b)(3) (eff. Jan. 1, 2011)), or by the document's "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Ill. R. Evid. 901(b)(4) (eff. Jan. 1, 2011).

¶ 72 We conclude that these alternative methods of authentication in the rules of evidence act to supplement the method of authentication provided in section 8-1206. As we noted above, Rule 901(b)(1) is substantially similar to section 8-1206. Compare Ill. R. Evid. 901(b)(1) (eff. Jan. 1, 2011) (document may be authenticated by "[t]estimony that a matter is what it is claimed to be"), with 735 ILCS 5/8-1206 (West 2010) (court record "may be proved by copies examined and sworn to by credible witnesses").

¶ 73 But if we were to read section 8-1206 as requiring sworn, live testimony *exclusively*, that interpretation would conflict with the numerous alternative methods of authenticating a document in Rule 901(b). We must avoid creating such a conflict between the rules of evidence and a statutory rule of evidence, especially in light of the fact that the committee comment to Illinois Rule of Evidence 101 (eff. Jan. 1, 2011) states that, with one exception not relevant here, at the time of the adoption of the rules of evidence in 2011, "[t]here [was] no *** statutory rule of evidence that [was] in conflict with a rule contained in the Illinois Rules of Evidence." Ill. R. Evid.

101, Comment (eff. Jan. 1, 2011); see also *Barragan v. Casco Design Corp.*, 216 Ill. 2d 435, 441-42 (2005) (court must avoid interpreting statutes to conflict with each other, where reasonably possible).

¶ 74    In any event, if there were a conflict between the rules of evidence and section 8-1206, the rules of evidence would control. See Ill. R. Evid. 101 (eff. Jan. 1, 2011) ("A statutory rule of evidence is effective unless in conflict with a rule or a decision of the Illinois Supreme Court."); *People v. Nixon*, 2015 IL App (1st) 130132, ¶ 107 ("[T]o the extent that there is a conflict between [a statute] and [a rule of evidence], Rule 101 dictates that [the rule of evidence] trumps the statutory section."). Thus, we must determine whether, under the rules of evidence, the State authenticated the purported copy of the second page of the complaint.

¶ 75    In this case, Rules 901(b)(3) and 901(b)(4) are particularly relevant. See Ill. R. Evid. 901(b)(3) (eff. Jan. 1, 2011) (document may be authenticated by "[c]omparison by the trier of fact or by expert witnesses with specimens which have been authenticated"); Ill. R. Evid. 901(b)(4) (eff. Jan. 1, 2011) (document may be authenticated based on its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances").

¶ 76    Specifically, the warrant issued by the judge in this case commands the search of certain premises and person of the defendant for a specific weapon, a "Black 9mm Semi-Automatic handgun and any ammunition or any other contraband *** [w]hich have been used in the commission of, or which constitute evidence of the offense of: 720 ILCS 5/24-1.1 UUW [unlawful use of a weapon] by [a] felon." The name of the approving assistant State's Attorney (ASA), Sean O'Callaghan, appears in the left margin, along with a notation indicating that it was presented for approval on February 17, 2011, at 21:50. The judge's signature, the judge's official number, and the

date and time of issuance—the next morning, February 18, 2011, at 9:22 a.m.—are also affixed to the warrant.

¶ 77    The first page of the complaint for search warrant similarly requests the issuance of a search warrant for the person and premises of defendant to seize a gun, any ammunition or any other contraband which have been used in the commission of, or which constitutes evidence of the offense of UUW by a felon. It then provides that the complainant states that he has probable cause to believe the items to be seized are now located upon the person of defendant and premises to be searched. It contains the same notations from the approving ASA in the left margin, as well as the same judge's signature, number, and date of issuance. It also demonstrates that the complaint included a second page; specifically, the last sentence on the first page ends without punctuation, and the last word of the sentence is 9mm—a partial description of the gun that is otherwise consistently and repeatedly described in more detail earlier on the same page as a 9-millimeter semi-automatic (or "semi-auto") handgun.

¶ 78    The second page of the complaint begins by completing the description of the gun, and ends with appropriate punctuation. When read with the actual search warrant and actual first page of the complaint, the information contained on the second page corresponds logically with all the information contained on the first page. It refers to the same defendant and premises to be searched, and contains the same name of the approving ASA, search warrant number, date and time of presentation.

¶ 79    Accordingly, the trial court could have authenticated the missing second page based on its "[c]omparison *** with specimens which have been authenticated," namely its comparison to the warrant and the first page of the complaint. Ill. R. Evid. 901(b)(3) (eff. Jan. 1, 2011). Likewise, the trial court could have authenticated the document based on the "[a]ppearance, contents, *** or

other distinctive characteristics" of the second page, "taken in conjunction with circumstances," such as the fact that the second page continues a sentence from the first page, clearly covers the same subject matter, and contains the same distinctive legend as both the first page and the warrant itself. Ill. R. Evid. 901(b)(4) (eff. Jan. 1, 2011).

¶ 80    The trial court did not err in authenticating the second page of the complaint for search warrant. In light of the unique similarities between the missing page two and the warrant and page one of the complaint, and defendant's lack of any evidence calling into question the second page's authenticity, we find no reason to disturb the trial court's finding that the State authenticated the second page of the complaint.[3]

¶ 81    We uphold the trial court's finding that the State properly authenticated the second page of the complaint. We thus affirm the trial court's ruling denying defendant's motion to suppress the evidence seized pursuant to the search warrant.

¶ 82                          III. CONCLUSION

¶ 83    For the reasons stated above, we affirm defendant's conviction and sentence. The State proved the *corpus delicti* of the offense at trial and sufficiently authenticated the search warrant at the hearing on defendant's motion to suppress.

¶ 84    Affirmed.

---

   [3] As the trial court's ruling was an evidentiary ruling, we would typically review it for an abuse of discretion. See *Nixon*, 2015 IL App (1st) 130132, ¶ 105. Arguably, the appropriate standard is the manifest-weight-of-the-evidence standard for findings of fact at a suppression hearing. See *Brown*, 2015 IL App (1st) 140093, ¶ 12. Because we would uphold the trial court's ruling under either standard, we need not settle this question.