# Illinois Official Reports

## Appellate Court

***People v. Carter*, 2021 IL App (4th) 180581**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID CARTER, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-18-0581 |
| Filed | June 30, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Livingston County, No. 87-CF-112; the Hon. Jennifer H. Bauknecht, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael L. Sklar, of Chicago, for appellant.<br><br>Randy Yedinak, State's Attorney, of Pontiac (Patrick Delfino, David J. Robinson, and Benjamin M. Sardinas, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Cavanagh and Holder White concurred in the judgment and opinion. |

**OPINION**

¶ 1        In November 1991, a jury convicted defendant, David Carter, of three counts of the first degree murder of Pontiac Correctional Center superintendent Robert Taylor, two counts of conspiracy to commit murder, and one count of solicitation to commit murder. Ill. Rev. Stat. 1987, ch. 38, ¶¶ 9-1(a)(1), (a)(2), 8-2(a), 8-1(a). The trial court later sentenced defendant to life in prison based upon one of the first degree murder convictions (count X). In 1993, on direct appeal, this court affirmed defendant's conviction and sentence for first degree murder (count X) and vacated all convictions other than count X pursuant to the one-act, one-crime doctrine. *People v. Carter*, No. 4-92-0298 (1993) (unpublished order under Illinois Supreme Court Rule 23) (*Carter I*).

¶ 2        In November 2017, defendant filed the amended successive postconviction petition that is the subject of this appeal. Defendant asserted a claim of actual innocence based on the previously unavailable testimony of his codefendants and a gang leader who supposedly took responsibility for orchestrating Taylor's murder. In April 2018, the trial court conducted a third-stage evidentiary hearing, and in July 2018, the court entered a written order denying defendant's claim for postconviction relief.

¶ 3        Defendant appeals, arguing the trial court's findings were against the manifest weight of the evidence. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5        A more detailed description of the procedural history of the case and testimony at trial can be found in *Carter I*. Further information can also be found in the opinions from his codefendants' appeals. See *People v. Johnson*, 250 Ill. App. 3d 887 (1993); *People v. Lucas*, 151 Ill. 2d 461 (1992); *People v. Easley*, 148 Ill. 2d 281 (1992). Here, we set forth only the information necessary for the resolution of this appeal.

¶ 6                              A. The Trial and Direct Appeal

¶ 7        In October 1987, the State charged defendant with five counts of first degree murder of Pontiac Correctional Center (Pontiac) superintendent Robert Taylor, two counts of conspiracy to commit murder, and three counts of solicitation to commit murder. Ill. Rev. Stat. 1987, ch. 38, ¶¶ 9-1(a)(1), (a)(2), 8-2(a), 8-1(a).

¶ 8        In November 1991, the trial court conducted defendant's jury trial, at which the State presented evidence that on September 3, 1987, Roosevelt Lucas and Ike Easley, two members of the same gang, the Black Gangster Disciples (BGD), attacked Taylor with a metal pipe and a "shiv" (homemade knife). Taylor later died from his injuries. The attack was believed to be in retaliation for the death of Billy Jones, another BGD member who had died three months earlier at Pontiac. The BGD believed Jones had been murdered by prison staff.

¶ 9        Two inmates witnessed the attack on Taylor and testified that Lucas and Easley were responsible. When interviewed by investigators, the inmates stated they saw Corwyn Brown nod to Lucas and Easley immediately before the attack. At trial, the inmates testified that they did not remember making any such statements.

¶ 10    The State also presented evidence of BGD's presence and control over the prison. The BGD was a highly organized gang with hundreds of members in Pontiac and other prisons around the state. They enforced their rules and hierarchy with violence.

¶ 11    Harry Martin testified he was formerly a high-ranking member of BGD but became an undercover informant for the Illinois Department of Corrections (IDOC) when he learned about a BGD plot to murder him. Martin testified that Brown was the second highest-ranked BGD member at Pontiac and Michael Akins was the highest. After Taylor's death, Martin posed as an envoy for the gang leader, Larry Hoover, to determine who had ordered the attack on a prison superintendent. Martin stated that (1) the attack was not ordered by gang leadership and (2) those who carried out the unauthorized attack would be "penalized severely," including being "eradicated from the organization."

¶ 12    Nearly five weeks after the attack on Taylor, Martin interviewed defendant at Pontiac and secretly recorded the conversation pursuant to a court-authorized wiretap. In that conversation, defendant stated (1) he participated in planning the attack on Taylor; (2) Michael Johnson, a high-ranking BGD member, instructed him to set up the attack; and (3) Brown had nothing to do with the attack, although Brown knew of it. Defendant also provided details of the attack, *i.e.*, how it was executed, how it was planned, and where he was during the attack. Defendant's descriptions largely aligned with other testimony about the attack given at trial.

¶ 13    Defendant did not testify at trial. Defendant attempted to admit statements from Lucas and Easley, obtained by a defense investigator, that defendant had nothing to do with the planning or execution of the murder. The trial court refused to allow the evidence because it did not fall within a hearsay exception. Lucas, Easley, Johnson, and Brown did not testify at trial.

¶ 14    The jury convicted defendant of three counts of first degree murder, two counts of conspiracy to commit murder, and one count of solicitation to commit murder. In March 1992, the trial court sentenced defendant to life in prison without the possibility of parole based upon one of the first degree murder convictions (count X).

¶ 15    Defendant appealed and challenged his conviction on numerous grounds. This court affirmed defendant's conviction in June 1993. See *Carter I*, No. 4-92-0298.

¶ 16                    B. The Successive Postconviction Petition

¶ 17    In November 2017, defendant filed an amended successive postconviction petition asserting that he had no involvement in the planning or execution of the murder of Taylor. Specifically, defendant alleged that he was ordered by Brown to take responsibility for the attack. Defendant attached affidavits from Brown, Easley, Lucas, and himself in support of his claim.

¶ 18    Brown executed two affidavits. In his 1996 affidavit, Brown averred that defendant, Johnson, Easley, and Lucas had nothing to do with Taylor's murder and asserted that two other individuals were responsible. Brown also took responsibility for the attack. Regarding defendant, Brown stated that defendant had no knowledge of the attack and that Brown ordered defendant to take responsibility after the murder had occurred. Brown stated that defendant did not have the authority in the gang hierarchy to order such an attack. Brown averred that the statements he gave to IDOC investigators were false and that he was now telling the truth.

¶ 19    In his 2014 affidavit, Brown described the BGD leadership structure in Illinois prisons and at Pontiac in particular. Brown stated that he took it upon himself to order an attack on Taylor

in retaliation for the death of Billy Jones, a relatively high-ranking BGD member, "with the general approval of the steering committee" at Pontiac. Brown stated he told Lucas and Easley to attack Captain Donnie Whitaker and told defendant and Johnson, "on pain of Gang directed death to them and injury to their families," to take responsibility for attacking Taylor. Brown stated that "toward the end of August" he told Lucas and Easley he needed their help with "something" and "[l]ater" told them to conduct a "hit" on "an administration official" in the part of the jail where Jones had been housed. On September 3, 1987, Lucas and Easley were outside of Taylor and Whitaker's office when Brown walked by and nodded to them to start the attack "on the office occupant." In the hours after the attack, Brown met with defendant and Johnson in the yard and told them to accept responsibility if BGD leadership made inquiries. Brown stated that they understood Brown had the authority to harm them and their families if they did not comply with the order. Brown stated he was worried about receiving the death penalty or being killed by gang leadership if anyone found out he was responsible for the attack on Taylor. Brown claimed he was coming forward because he had received a life-threatening medical diagnosis and wanted to right a wrong.

¶ 20 Easley executed an affidavit dated October 2014, in which he averred that Brown contacted him toward the end of August 1987 and stated he needed help with something he was planning. Brown told Easley that he would provide details later. In early September 1987, Brown told Easley and Lucas to attack a prison administrator in retaliation for Jones's death. On September 3, 1987, Easley was standing with Lucas and Brown outside of Whitaker and Taylor's office when Brown motioned to attack. Easley stated that Brown told him about a month later to tell Harry Martin that defendant had ordered the attack. Easley stated Brown could have used defendant as a "go between" but he did not. Brown wanted defendant to take the blame to avoid retaliation from gang leadership for the unauthorized attack. Easley also averred that he told an investigator in 1991 that defendant never instructed him to attack Taylor or anyone else. Easley wanted to testify but did not on advice of counsel because Easley was facing a death sentence.

¶ 21 Lucas provided an affidavit in August 2014 that was similar to Easley's. Lucas averred that (1) Brown alone instructed him to attack Taylor, (2) Brown directed defendant, under the threat of death, to take the blame for Taylor's murder, (3) Lucas told an investigator defendant was innocent in 1991, and (4) Lucas was willing to testify at defendant's trial but was advised not to by counsel.

¶ 22 In October 2014, in an affidavit presented in support of his motion for leave to file a successive postconviction petition, defendant averred that Brown ordered him under threat of physical violence to himself and his family to take responsibility for the attack if BGD leadership asked. Defendant was to say he and Johnson recruited Lucas and Easley. Defendant denied having knowledge of the attack before it occurred or participating in any way. Defendant also detailed his efforts to contest his conviction and explained that, although he tried for years to get Brown, Easley, and Lucas to testify that defendant was innocent, he was unable to reach them and they had been unwilling to help until recently.

¶ 23                              C. The Third-Stage Evidentiary Hearing
¶ 24 In April 2018, the trial court conducted a third-stage evidentiary hearing at which Brown, Easley, Lucas, and defendant each testified. In addition, the parties stipulated to the admission of (1) the prior exhibits to the amended petitions, including affidavits, (2) the IDOC

investigation report of Taylor's murder, and (3) the transcripts and exhibits from a 1996 legislative investigation conducted by the Illinois House of Representatives about gang violence in prisons.

¶ 25     Brown, Easley, and Lucas testified substantially in conformity with their affidavits except as noted by the trial court in its written order, which we later discuss in detail. *Infra* ¶¶ 43-50.

¶ 26                                 1. *Defendant*

¶ 27     Defendant testified that he was a BGD member at Pontiac in the 1980s. Defendant stated the BGD "ran every aspect of the prison" and maintained that the "gang leaders controlled whether or not you lived or died." Defendant said that he tried to leave the gang shortly after he arrived at prison in 1983 because of "the brutality and the savagery that was being inflicted upon the prison population by the gang leaders."

¶ 28     Defendant testified that in 1987 he was the chief of security of the south cell house. On September 3, 1987, defendant was in his cell on seven gallery when another inmate approached, telling defendant there was an emergency. Defendant stepped out of his cell, which was two floors above Taylor and Whitaker's office, and saw correctional officers running into the building. Defendant looked down onto five gallery and saw Taylor lying on the floor.

¶ 29     Defendant stated the prison went on lockdown after the attack and, about three hours later, he found out from other inmates that the BGD had something to do with the attack. Easley and Lucas, low-ranking members of BGD, were the ones who carried out the attack. Defendant denied ever ordering them to attack anyone on September 3.

¶ 30     Defendant said he received a "kite" (written letter) from Brown about three hours after the attack on Taylor. Defendant explained that the BGD created a system to communicate with one another when the institution was on lockdown and that kites were used in those instances. The kite told defendant (1) to take responsibility for the murder of Taylor with gang leadership and the board of directors and (2) Brown was not going to let anything happen to defendant. Defendant believed that if he disobeyed an order from Brown he would be killed. Defendant testified that he told Harry Martin that he had ordered the attack even though that was false because Brown ordered defendant to take responsibility.

¶ 31     On cross-examination, defendant stated that the gang leaders were responsible for the brutality even though gang members carried those actions out. Members could not take actions on their own because they would be "violated or killed themselves." Defendant agreed that, as head of security for "the south uppers," he both ordered and carried out violations and punishments. Defendant qualified his agreement by saying he was a part of the gang and "those were the rules of the gang." Defendant insisted that he never ordered "stabbings or anything like that." Defendant further downplayed his involvement in meting out punishment by saying he did not carry out "a lot" of violations and that he "was only in the position for three months."

¶ 32     Defendant testified that "failing to protect or insulate a superior gang member" was a severe infraction for which a gang member could be killed. Defendant clarified that he was worried about punishment from both leadership inside Pontiac and gang leadership more generally, including Hoover and the board of directors. Defendant stated that, if he took sole responsibility for an unauthorized attack, his life would be in jeopardy from the board.

The State played the audio recording of defendant's conversation with Martin, which was also played at defendant's jury trial. In that recording, Martin told defendant that Brown had contacted him about the incident and Hoover had instructed Martin to find out what had happened. Defendant stated that Johnson gave the instructions and they planned for three to four weeks in advance to hit someone in the head with metal pipes. Defendant confirmed his, Johnson's, and Brown's positions in the prison hierarchy and stated that Brown knew what was going on but was not supposed to know. Defendant said that, on the day of the attack, Brown asked to be placed in segregation because he did not want to be around when the attack occurred. Defendant said Brown had abandoned the BGD. Brown had not acted like the assistant institutional coordinator should. Defendant said he "was kinda leery about [Brown] from the beginning all the way around the board. I didn't even want him to know about nothing. He ain't security material at all."

Defendant stated the attack was in retaliation for the mistreatment of inmates at the hands of prison administration and for the killing of Jones. Defendant said he sent Lucas and Easley to carry out the attack. Defendant said he explained to them that they were to go in, hit "this motherfucker in his head, knock him out," and then leave. Defendant explained that he had one security person playing his radio loudly and another posted at "the gate" to prevent anyone from going in or out. Defendant stated that Lucas and Easley went into Taylor's office and, "about five seconds after they come out," Taylor came out. Defendant stated that Lucas and Easley wore masks and gloves and dropped their weapons at the gate after the attack and that others wiped the weapons down in an effort to remove any fingerprints.

Martin stated that Johnson told him that "it went up before the committee about a week and a half in advance. He said it was brought before them and they okayed it, and [Pontiac gang leader Michael Akins] was telling me he didn't know nothing about it." Defendant responded, "[Akins] knew about that, man. If he told you that, he told you a lie." Martin thought that Akins was downplaying what he knew because he was worried Hoover would be angry.

Martin told defendant that Brown insisted he knew nothing about the attack until after it happened. Defendant responded that Brown was lying and opined that Brown and Akins were attempting to put the blame on Johnson and make him "the fall guy." Defendant insisted that everyone was in agreement that the attack on Taylor should happen.

Defendant argued that the testimony was consistent that Brown ordered the attack and defendant was not involved. Defendant emphasized the fear of both gang retribution and the death penalty as reasons for Brown to order defendant to "take the fall" for murdering Taylor and why defendant would do so. Defendant acknowledged that Brown had lied previously but argued that Brown came forward in 1996 to accept responsibility when the death penalty was still a potential punishment. Defendant also noted that the testimony and affidavits from the witnesses at the hearing were consistent with the IDOC report and statement of the two eyewitnesses to the attack that Brown nodded to Lucas and Easley to initiate the attack.

The State argued that the testimony was inherently suspect and would not have changed the result on retrial. The State emphasized that Brown lied to IDOC investigators and lied in his 1996 affidavit. The State further emphasized the fact that Brown was now facing a life sentence and had nothing to lose by coming forward. The State pointed out that the other

witnesses were similarly serving life sentences. The State also noted that the testimony "varied wildly" on important details such as (1) when the order to attack was given, (2) who knew about the attack in advance, and (3) authority in the gang and punishments for acting without authority. Finally, the State argued that defendant's confession to Martin was consistent with the testimony at trial and defendant disparaged Brown in the recording. The State asserted that, given the hierarchical nature of the gang, one person did not have to be responsible for the conspiracy. In other words, even if Brown had given the order, the evidence suggested that defendant was still a part of the conspiracy and responsible for the murder.

¶ 41                    D. The Trial Court's Written Order

¶ 42    In July 2018, the trial court entered a 17-page written order denying defendant's claim for postconviction relief. After recounting the procedural history of the case and the appropriate standards for successive postconviction petitions and actual innocence claims, the court set forth in detail the testimony provided by the witnesses at the evidentiary hearing. The court concluded that the testimony constituted newly discovered evidence. The only question remaining for the trial court was whether the evidence "would probably change the result."

¶ 43    The trial court began by reviewing Brown's testimony and noted several inconsistencies. The court stated that everyone knew and agreed an attack should happen and the steering committee agreed a guard should be attacked but that Brown acted like he made the decision in a vacuum. In his 2014 affidavit, Brown said he directed defendant and Johnson to accept responsibility, but he testified that only Johnson was to take responsibility. Brown's affidavit said he talked to Lucas and Easley about the attack days in advance and he told them to attack the "occupant" of Whitaker's office. But at the hearing, Brown testified that he told them to attack Whitaker specifically and did not know who was in the office.

¶ 44    Further, in his affidavits and testimony, Brown said he had a "life threatening illness," which was the impetus for his coming forward in 1996 and 2014, but the trial court found it incredible that he had a life-threatening illness for 20 years. The court concluded that Brown had so many different stories that he was simply incredible, and the court could not believe a word he said. The court also noted that Brown "seem[ed] to be protecting a co-conspirator," was "very evasive on cross," and "said what he thought needed to be said rather than getting the truth out."

¶ 45    The trial court found that Easley appeared biased and had nothing to lose by testifying. The court noted that Easley could not remember details on cross-examination and was argumentative. The court continued, "At times it seemed as if Easley was just making things up as he went along. He lost all credibility when he insisted that he only stabbed Taylor three times and that any other stab wounds were caused by [Pontiac] staff."

¶ 46    The trial court found that Easley's testimony was inconsistent with other evidence at the hearing and inconsistent with what was presented at trial. For example, Easley claimed he "managed the whole unit of the south house" but was actually a low-level member. Citing the IDOC investigation and report, the court noted that in 1987 Easley told Martin that defendant instructed Easley and Lucas to hit Taylor with pipes. Easley testified differently at the hearing, and the inconsistency was never addressed. In his 2014 affidavit, Easley said Brown told him to tell Martin that defendant gave Easley the order. But neither Brown nor Easley testified to that effect at the evidentiary hearing.

¶ 47    Regarding Lucas, the trial court said, "It was very difficult to understand Lucas. He was very quiet and tended to mumble his words. His answers were short and at times did not make a lot of sense. Further his testimony was inconsistent with the other evidence presented." The court noted that Lucas said he found out about the attack on the day it occurred and denied talking to Brown about retaliation for Jones's death before then. Lucas mentioned Brown taking a knife away, which no one else mentioned. The court found "that Lucas is not a credible witness given these inconsistencies and the overall demeanor of Lucas while he testified. He too was saying what he needed to say to help out defendant, or at least what he thought would help."

¶ 48    Regarding defendant, the trial court said, "Defendant was well-versed and articulate about gang violence and control, but tended to embellish somewhat when needed. He lost credibility when he testified that he knew nothing about the impending attack even that day and suggested he didn't find out until later that it had been the BGDs." The court noted that "there [was] little doubt that everyone at [Pontiac]" knew something was coming. Defendant said he received a kite, but Brown denied sending one. The court was skeptical (1) that a note could reach defendant while on lockdown and (2) that Brown would put such incriminating information in writing. The court further noted, "On cross-examination, defendant became somewhat argumentative and seemed to downplay the extent of the violent acts taking place at his direction."

¶ 49    Regarding the State's case, the trial court noted that the evidence showed (1) there was a three-to-four-week planning period and (2) everyone above defendant, including Akins, Brown, and Johnson, was aware of the planned attack. Defendant knew details of the attack and criticized Brown instead of providing cover for him. The court concluded that the plan laid out by defendant to Martin was consistent with the chain of command and "all the other evidence in the case."

¶ 50    In its written order denying defendant's amended successive postconviction petition, the court explained its conclusion, in part, as follows:

        "However, based upon the foregoing credibility determinations coupled with the strength of the evidence at the original trial, the court finds that this newly discovered evidence probably would not lead to a different result at trial. First of all, it is highly suspicious that Brown, Easley and Lucas would all wait until after they each had a sentence of life without parole before coming forward and more than a mere coincidence that they were all in Stateville with defendant when they decided to come forward. Even if these four individuals are no longer gang members or even friends, they will forever be joined by this very brutal incident and it would not be a stretch to suggest they still have each other's backs after all these years. None of them have anything to lose by coming forward now and the defendant stands to gain a lot. Further, there are many inconsistencies between their respective versions of events such that their story lacks all credibility. Their statements and testimony differ in several key aspects including who held what position with the gang on September 3, 1987, who had authority to order the attack, when the impending attack on Whitaker was conveyed to Easley and Lucas (days before, a day before or that morning), who they were supposed to 'jump' (Whittaker or Whittaker and Shettleworth), who was supposed to take the blame for ordering the hit (Johnson or defendant), and how Brown conveyed

- 8 -

to defendant to take the blame (verbally in the yard or in writing by a 'kite'). The evidence tendered in connection with this petition is simply not credible.

Furthermore, in reviewing the original trial record in its entirety, it is clear that the evidence against defendant at his jury trial was strong and compelling. His recorded conversation with Martin was a key piece of evidence and was corroborated by many witnesses and multiple exhibits. *** Additionally, many of the details defendant provided to Martin were confirmed by other trial witnesses[.] *** [Defendant] made several disparaging comments about Brown and insinuated he could not be trusted. If [defendant] was trying to cover for Brown because he feared for his life, it is unlikely that he would have spoken so bluntly about Brown. Furthermore, it is unclear why Brown would need to create this elaborate conspiracy in the first place. Brown was second in command at Pontiac. He was in a position to make this call.

Finally, defendant's theory that Brown ordered the attack, not defendant, was presented and argued to the jury. *** The jury was well-aware of the involvement of others in the gang including Brown. The very incredible evidence presented here is not likely to add any strength to this argument. It is not one or the other. They can both be responsible for the brutal attack along with Johnson, Easley and Lucas. Even when considered together with the evidence of rampant gang violence, the outcome would likely be the same.

In sum, defendant has failed to meet his burden of proof on his claim of actual innocence. He has not presented any credible evidence that is so conclusive it would probably change the result of the trial. Defendant's argument that Brown alone is responsible for ordering the attack on Taylor is not credible and completely ignores the other substantial and compelling evidence of defendant's guilt."

¶ 51     This appeal followed.


¶ 52                                    II. ANALYSIS

¶ 53     Defendant appeals, arguing the trial court's factual findings were against the manifest weight of the evidence. We disagree and affirm.


¶ 54                      A. The Standard of Review and Applicable Law

¶ 55     The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a criminal defendant the means to redress substantial violations of his constitutional rights that occurred in his original trial or sentencing. *People v. Robinson*, 2020 IL 123849, ¶ 42; 725 ILCS 5/122-1(a)(1) (West 2016). The Act contemplates the filing of only one postconviction petition. 725 ILCS 5/122-3 (West 2016). However, a defendant may be granted leave to file a successive postconviction petition when that defendant sets forth a claim of actual innocence. *People v. Ortiz*, 235 Ill. 2d 319, 330, 919 N.E.2d 941, 948 (2009).

¶ 56     To succeed on a claim of actual innocence, a defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96, 996 N.E.2d 617. The parties do not dispute the trial court's finding that the evidence presented at the third-stage hearing was new, material, and noncumulative.

¶ 57   "[T]he trial court then must consider whether that [new] evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make." *Id.* ¶ 97. However, the trial court should not redecide a defendant's guilt or innocence when determining whether to grant relief. *Id.*; see also *People v. Molstad*, 101 Ill. 2d 128, 136, 461 N.E.2d 398, 402 (1984) ("[T]his does not mean that [the defendant] is innocent, merely that all of the facts and surrounding circumstances *** should be scrutinized more closely to determine [his] guilt or innocence."). "[T]he new evidence supporting an actual innocence claim need not be entirely dispositive to be likely to alter the result on retrial." *Robinson*, 2020 IL 123849, ¶ 56. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Coleman*, 2013 IL 113307, ¶ 97.

¶ 58   At a third-stage hearing, "the trial court acts as a fact-finder, making credibility determinations and weighing the evidence. [Citation.] Accordingly, we review the court's decision to deny relief for manifest error." *People v. Reed*, 2020 IL 124940, ¶ 51. "Manifest error is 'clearly evident, plain, and indisputable.' [Citation.] Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." *Coleman*, 2013 IL 113307, ¶ 98 (quoting *People v. Morgan*, 212 Ill. 2d 148, 155, 817 N.E.2d 524, 528 (2004)). Reviewing courts apply the manifestly erroneous standard in recognition of "the understanding that the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a position of advantage in a search for the truth which is infinitely superior to that of a tribunal where the sole guide is the printed record." (Internal quotation marks omitted.) *People v. Coleman*, 183 Ill. 2d 366, 384, 701 N.E.2d 1063, 1073 (1998).

¶ 59                                B. This Case

¶ 60   Defendant points to *Ortiz*, *Coleman*, and *Molstad* as cases in which the Illinois Supreme Court has reversed third-stage credibility determinations made by a trial court. He argues that his case is similar in character and the same result should follow. We disagree.

¶ 61   The problem for defendant is that each one of those cases is *sui generis*, as are all third-stage postconviction proceedings. In the cases cited by defendant, the supreme court determined, for various reasons, that the evidence presented at the evidentiary hearings was sufficient to merit a new trial. However, the only consistent takeaway from those cases is the legal standard that courts must apply when evaluating the evidence presented at third-stage proceedings in which a defendant has raised claims of actual innocence.

¶ 62   In such cases, the supreme court has consistently held that a new trial is warranted if the evidence is of such a character that it undermines confidence in the verdict. *Coleman*, 2013 IL 113307, ¶ 97. The court has explained that, after receiving evidence and hearing testimony, the trial court must evaluate the new evidence along with the trial evidence and weigh the probability of a different outcome upon retrial. Because trial courts must both (1) make credibility determinations and (2) consider the new evidence with the trial evidence, every case is fact intensive, unique, and to be considered on its own merits. Given the unpredictable nature of fact finding in general and juries in particular, comparing any given court opinion against the circumstances of a particular case before the trial court at a third-stage hearing is of minimal value, if any.

¶ 63    We are not unsympathetic to defendant's position. Although it is possible the trial court could have agreed with his assessment of the new evidence, found his witnesses credible, and ordered a new trial, the court did not do so. And he fails to offer this court any convincing reason to reject the trial court's credibility determinations.

¶ 64    For instance, defendant argues, "It is obvious from his demeanor and halting testimony that Lucas is not the brightest star in the prison sky. But this is not a basis for throwing out his testimony in its entirety." However, demeanor and paralanguage are precisely the details fact finders are called upon to consider when evaluating credibility, as well as the details that this court cannot discern by reading a transcript. (We later explain the term "paralanguage." See *infra* ¶ 69.) Indeed, as we explain, this case demonstrates the wisdom and importance of deferring to a fact finder's determinations in all third-stage proceedings. This includes not just actual innocence claims but also those in which a defendant must prove the substantial denial of a constitutional right by a preponderance of the evidence—that is, all postconviction claims other than actual innocence claims.

¶ 65                    1. *A Reviewing Court's Deference to Fact Finders*

¶ 66    We take particular note of—and are thankful for—the trial court's careful evaluations of the witnesses in its written order, such as the following: "Brown was very evasive on cross." "Brown said what he thought needed to be said rather than getting the truth out." "[Easley] was argumentative and provided little detail" on cross-examination. "At times it seemed as if Easley was just making things up as he went along. He lost all credibility when he insisted that he only stabbed Taylor three times and that any other stab wounds were caused by [Pontiac] staff." "It was very difficult to understand Lucas. He was very quiet and tended to mumble his words. His answers were short and at times did not make a lot of sense." "The court finds that Lucas is not a credible witness given [his] inconsistencies and the overall demeanor of Lucas while he testified. He too was saying what he needed to say to help out defendant, or at least what he thought would help." "On cross-examination, defendant became somewhat argumentative and seemed to downplay the extent of the violent acts taking place at his direction."

¶ 67    These findings show that the trial court was relying heavily on the demeanor and paralanguage of the witnesses. The court explicitly stated it made its ruling "based upon the foregoing credibility determinations coupled with the strength of the evidence at the original trial."

¶ 68    Any time a trial court serves as a fact finder, perhaps the single most important thing the court can do is say whom it believes and whom it does not. When the trial court favors us with such a finding, we are at the height of our deference to that court. See *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 57 ("We are especially deferential when, as here, the court makes an explicit credibility finding after hearing conflicting testimony.").

¶ 69    In *People v. Hadden*, 2015 IL App (4th) 140226, ¶ 28, 44 N.E.3d 681, this court explained "paralanguage" and explicitly agreed with the law review article we cited in that case, writing as follows:

        "We note that deferring to the jury is particularly important when the jury is considering an audio-recorded statement as opposed to a written transcript. Spoken language contains more communicative information than the mere words because spoken language contains 'paralanguage'—that is, the 'vocal signs perceptible to the

- 11 -

human ear that are not actual words.' Keith A. Gorgos, *Lost in Transcription: Why the Video Record Is Actually Verbatim*, 57 Buff. L. Rev. 1057, 1107 (2009). Paralanguage includes 'quality of voice (shrill, smooth, shaky, gravely, whiny, giggling), variations in pitch, intonation, stress, emphasis, breathiness, volume, extent (how drawn out or clipped speech is), hesitations or silent pauses, filled pauses or speech fillers (*e.g.*, "um/uhm," "hmm," "er"), the rate of speech, and extra-speech sounds such as hissing, shushing, whistling, and imitations sounds.' Gorgos, *supra*, at 1108. The information expressed through paralanguage is rarely included in the transcript, as there is generally no written counterpart for these features of speech. Gorgos, *supra*, at 1109."

¶ 70    We reaffirm what we wrote in *Hadden*. Paralanguage is critical to evaluating oral testimony, and we note that paralanguage is even more important when evaluating witnesses who are testifying from the witness stand than it is, as in *Hadden*, when evaluating a recording of what a witness said. When assessing credibility, a trial court is called upon to evaluate everything together—visual (demeanor, body language), audio (tone), and the effect of the witness's testimony (*i.e.*, the impact a witness's testimony has upon the listeners)—which is an entirely different task than this court's when reviewing a cold record devoid of all of the crucial ways in which humans communicate in person, both verbally and nonverbally.

¶ 71    The old adage that it is not what one says but how one says it comes to mind. Identical words can have vastly different meanings based solely on the speaker's tone, body language, or both. And these factors may have a profound effect on a fact finder's evaluation of a speaker's credibility, believability, or trustworthiness. That is to say, a person's tone or body language can enhance or detract from his credibility. Judging whether someone is testifying truthfully, fully, honestly, and earnestly is nigh impossible from the mere words on a page.

¶ 72                              2. *The Trial Court's Findings Were Not*
                              *Against the Manifest Weight of the Evidence*

¶ 73    Here, the trial court's written order shows that the court thoroughly reviewed all of the material available to it and made detailed findings explaining its credibility determinations. Defendant contends that the court downplayed any consistencies and overemphasized minor inconsistencies, which he blames on the witnesses' faulty memory of a long-ago occurrence. But the trial court viewed the witnesses and heard their testimony firsthand, considered defendant's arguments, and ultimately rejected them. Thus, when the court explained its decision, one should not be surprised that the court highlighted the specific contradictions that caused it to lose faith in a particular witness's honesty.

¶ 74    It is not the role of this court to second-guess the trial court based on our own interpretation of the testimony contained in a cold record. Defendant's burden on appeal is to show it is "clearly evident" from the record that a conclusion opposite that of the trial court is true. Because the trial court's findings and credibility determinations were reasonable, we conclude that defendant has not met his burden.

¶ 75                              3. *Appellate Review of Third-Stage Hearings*

¶ 76    In his reply brief, defendant claims, "Where credibility issues are primary, as they are in this case, the analysis required is to first assess whether the credibility rulings stand up or not against the manifest weight of the evidence and only after that analysis is completed, can a

reviewing court correctly assess the result." Defendant contends that credibility determinations and the ultimate result are "two distinct processes" that must be reviewed separately under the manifest weight standard. Defendant provides no citation or support for this novel assertion, and we emphatically reject it.

¶ 77    The trial court is not required to do anything more at a third-stage hearing than it is required to do when conducting a bench trial. The fundamental difference between the two is that at a third-stage hearing, the court is not called upon to assess guilt or innocence but instead to apply a specific test—namely, for actual innocence claims, whether the defendant has presented evidence of such a character as to undermine confidence in the defendant's conviction and, for all other claims, whether the defendant has proved a substantial denial of a constitutional right. That determination is made after considering all of the evidence, both old and new. In performing this task, the court is not required to make any explicit findings or discuss what evidence it found credible or not credible any more than it would be required to make such explicit findings to explain its decision after conducting a bench trial. (We are quick to add that many judges believe it a good practice to provide such an explanation, and we do not dispute that. All we are saying is that such explanations are not legally *required*.)

¶ 78    On review, we consider the record and determine if the trial court's ultimate determination is against the manifest weight of the evidence. We do not second-guess credibility determinations or substitute our judgment for that of the fact finder. Plainly stated, this court reviews the *totality* of the evidence underlying the trial court's judgment.

¶ 79    Last, we thank the trial court for providing a detailed written order that contained explicit credibility determinations, which this court found particularly helpful in the resolution of this appeal.

¶ 80                                      III. CONCLUSION
¶ 81    For the reasons stated, we affirm the trial court's judgment.

¶ 82    Affirmed.

- 13 -