2021 IL App (1st) 191706-U
No. 1-19-1706
Order filed November 15, 2021
Modified on denial of rehearing December 30, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 14713 |
| | ) | |
| NATHANIEL CARSWELL, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE HYMAN delivered the judgment of the court.
Justice Walker and concurred in the judgment.
Justice Coghlan dissented.

**ORDER**

¶ 1   *Held*:   Trial court's judgment reversed where the evidence at trial was insufficient to corroborate Carswell's confession.

¶ 2   The trial court found Nathaniel Carswell guilty of unlawful possession of a weapon by a felon and sentenced him to 42 months' imprisonment. On appeal, he alleges the trial evidence failed to prove him guilty beyond a reasonable doubt, and his trial counsel provided ineffective assistance by forgoing a motion to quash his arrest and suppress evidence following an unlawful

search of the car in which Carswell was a passenger. We reverse, finding insufficient evidence to corroborate his confession under the *corpus delicti* rule.

¶ 3                                    Background

¶ 4      Chicago police officer Sean Lynch testified that he and his partner, dressed in plain clothes, conducted a traffic stop based on "[m]inor traffic violations," namely, a cracked side mirror and expired vehicle registration sticker. Carswell, whom Lynch identified at trial, sat in the front passenger's seat. Another man sat in the driver's seat, and a woman sat behind the driver's seat. When the officers turned on their lights, Lynch saw Carswell "make rapid movements with his whole body, including his hands," towards the seat directly behind him. Nothing obstructed Lynch's view of Carswell. Lynch did not recall the car's windows as tinted. Lynch went to the driver's side and, as he conducted a "field interview," smelled "a strong odor of fresh cannabis."

¶ 5      The officers asked the three occupants to get out so they could "perform a narcotics investigation." Lynch looked "all over" inside the car and saw a "suspect cannabis" bag in the middle of the rear floor. In the "rear portion of a child safety seat" in the backseat, Lynch saw "what [he] immediately recognized to be the barrel or the slide and barrel of a handgun." Lynch recovered the handgun, which he determined was loaded. The officers temporarily detained the occupants, and Lynch Mirandized them. Then, Lynch asked, "[W]hose gun is it?" Carswell responded, stating something "along the lines of, it's my gun. I've been to prison before. Let's get this over with. I have to pee." The officers arrested Carswell.

¶ 6      On cross-examination, Lynch could not recall the car coming out of a White Castle parking lot or how long he watched the car before stopping it. In addition, Lynch did not see "any object" in Carswell's hands. Instead, Lynch smelled cannabis as he approached and saw it on the rear

floorboard. Finally, Lynch confirmed that the car belonged to the driver, Antonio Henderson, and the woman's name in the back seat was Iyanna Moore.

¶ 7 According to Lynch, the child safety seat was "forward-facing," and the handgun located inside a "manufactured hole***" in the back of the seat and closer to the passenger's side than the driver's side. Lynch was on the passenger side when he "looked in" and saw the barrel of the handgun. He had to "tilt***" the child safety seat to retrieve the handgun, but the gun was not "wedged"; rather, it appeared "placed." Lynch did not use his cellphone to record Carswell's statement that the handgun belonged to him or have Carswell write down the statement.

¶ 8 On redirect examination, Lynch said Carswell's movements towards the rear seat were "directly consistent" with the location of the handgun in the child safety seat. On recross-examination, Lynch confirmed Carswell was "only five-five."

¶ 9 The parties stipulated that Carswell had a qualifying felony conviction for UUWF in 2013.

¶ 10 Moore testified Carswell was her boyfriend. She worked in construction with Carswell's friend Henderson, who was driving her and Carswell "to the west side of Chicago to work." The car belonged to the mother of Henderson's child. As they drove on 79th Street, police officers in a marked car pulled them over into a White Castle parking lot. Henderson rolled the window down, and the officers "asked for license and registration." They told Henderson, "they were pulling him over because his driver's side mirror has a lot of cracks in it."

¶ 11 The officers then asked the three occupants to get out and placed them behind the car. One officer remained with them while a second officer searched the car. The officers did not find anything. After the search, the officers told the three to return to the car, told Henderson "to get his mirror fixed," and "let [them] leave." Moore did not see Henderson receive a traffic ticket.

¶ 12    Henderson drove back onto 79th street and "didn't even get halfway to the next block" when an unmarked "detective car" approached from the opposite direction, made a U-turn, "sped past three cars," and got behind them. Henderson turned right, and the officer "sped up a little bit more" and "flicked" them. Henderson pulled over.

¶ 13    The officers approached on both sides. They were not wearing body cameras. An officer asked Henderson for his license and registration. Henderson responded, "I just got pulled over; what is this stop for?" The officer said he did not "care" and asked for Henderson's license and registration again, which Henderson gave the officer. The officer looked at the information and then asked the occupants to "step out of the car."

¶ 14    The officers placed Moore, Henderson, and Carswell behind the car and handcuffed Henderson and Carswell. Henderson asked, "what was probable cause for us stepping out of the car" and told the officers they were just pulled over "about the window." One officer searched the car. Moore did not see the officers remove anything, but they asked Moore, Henderson, and Carswell "whose gun it was." Neither Henderson nor Carswell said, "it was his gun." While Moore sat in the backseat, she did not see a firearm "coming out" of the back of the baby seat, and she did not see Carswell have a firearm or place a firearm in the seat.

¶ 15    On cross-examination, Moore testified that she was on her way to work that day. She confirmed that she did not see the officers retrieve a firearm, but they asked "whose gun is it," and "no one responded." An officer then asked Moore, "Did anyone tell [you] to put a gun in the back seat, did anyone tell [you] to put a gun in a baby carriage?" Moore asked, "What gun," and replied, "no." After Carswell's arrest, an officer told Moore and Henderson to "drive away."

¶ 16    Carswell testified that Henderson, a "friend of the family," was driving Carswell and Moore to Maywood. The car belonged to the mother of Henderson's child. Police officers in a marked car stopped them around the intersection of 79th and Racine at a White Castle parking lot. When Henderson produced his license and insurance information, the officer asked Henderson if he was "on any parole or probation," and Henderson stated "yes." The officer then asked Henderson to "step out of the vehicle," and Moore, Henderson, and Carswell got out. Officers searched for about three minutes, and an officer told Henderson "he needed to get his mirror fixed" and let them "proceed."

¶ 17    About one-and-a-half blocks from the parking lot, officers in a "brown, unmarked car" stopped them. The officers placed them behind the car, and one of the officers searched inside the car for about two-and-a-half minutes. The officer asked, "Whose weapon is it," and no one replied. The searching officer did not show Carswell a firearm. Carswell did not have a firearm that day, did not reach back and place a firearm behind a car seat, and did not place a firearm behind the child safety seat.

¶ 18    In closing, Carswell argued (i) the firearm was not his; (ii) no one saw him with a firearm; (iii) given the height of "five-five," it was "virtually impossible" that he could reach back and place a gun in the child seat in the time between when Lynch saw him move and the police curbed the car; and (iv) although he could possibly have reached back and dropped a bag of cannabis, his alleged admission to owning the handgun made no sense.

¶ 19    The trial court found Carswell guilty and merged "[a]ll counts" into UUWF count I. The trial court found Lynch "the most credible witness," recounting that Lynch saw Carswell making

"dramatic-type gestures" towards the back, and "[a]lso right there was the baby seat." The judge did not think just being "five-five" made it impossible to place something in the baby seat.

¶ 20    The judge recounted that a quick search recovered the gun "right where" Carswell made his gesture and Carswell "volunteer[ed]" that the recovered firearm belonged to him. The judge said Carswell was "at least stand up enough to take responsibility for his contraband" by making a statement against his penal interest and helping the police understand "they ought not be investigating his girlfriend and Mr. Henderson who had nothing to do with this."

¶ 21    Carswell filed a motion for a new trial, alleging the State failed to prove him guilty beyond a reasonable doubt, and he did not receive a "fair and impartial trial." Trial counsel informed the court that Carswell wanted to proceed without counsel. Carswell told the court that his counsel did not "[t]horoughly investigate [his] case," and he "asked for visits to speak with her." The court continued the case for a hearing as prescribed by *People v. Krankel*, 102 Ill. 2d 181 (1984), and discussed Carswell's claim that counsel failed to obtain body camera footage of his arrest.

¶ 22    At a later hearing, Carswell told the court, among other things, that he asked his trial counsel to file a motion to quash arrest and suppress evidence and "informed that no motion was suitable for [his] case." Counsel told the court she had reviewed the file with her supervisor and a colleague and believed a motion to suppress would have been frivolous. Carswell then argued that the State "failed to show probable cause of the initial stop," which was a "minor traffic infraction." He also claimed there was "marijuana in [his] discovery" for which he was not charged; yet, the police used the marijuana as "grounds for conducting a full search of the vehicle." The court continued the case to review the trial transcript.

¶ 23 The trial court denied Carswell "any relief under *Krankel*." Carswell said he did not want his counsel to represent him and would represent himself. The court permitted a continuance for Carswell to retain a private attorney. Carswell's new counsel filed an appearance, and the court granted Carswell's appointed trial counsel leave to withdraw.

¶ 24 Carswell's new counsel filed a "motion for a finding of not guilty or a new trial," alleging ineffectiveness of counsel for failing to file a motion to suppress, and for "admitt[ing] to the trier of fact that raw cannabis was in the vehicle at the time of the stop." Relevant here, Carswell asserted that the officers initially stopped the car for a cracked side mirror, which "had nothing to do with" him, and "the police had no legitimate right" to take him into custody and search the car. Carswell claimed the smell of cannabis also did not warrant a search, and it could be "strongly argued that *** the state did not present any cannabis evidence *** because there was no cannabis evidence to present." Carswell also argued that nothing gave rise to a reasonable suspicion that he and the others were "armed and dangerous."

¶ 25 The court denied Carswell's posttrial motions, stating "there are reasons to file and not to file pretrial motions," including that "admitting standing" to bring a motion to suppress "might compromise claims of lack of possession." The court found that Carswell's case "was vigorously defended" and stated, "I'm not finding that [Carswell's trial counsel] was at fault in any way in her way of proceeding on the case." The court imposed 42 months' imprisonment.

¶ 26                                    Analysis

¶ 27 Carswell first asserts the State failed to prove him guilty beyond a reasonable doubt, where no evidence indicated that he knowingly possessed a firearm as his admission was "contrary to

human nature." He also argues the State did not satisfy the *corpus delicti* rule having presented no evidence to corroborate his admission.

¶ 28    The United States Constitution requires "that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When reviewing a challenge to the sufficiency of the evidence, this court considers " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 433 U.S. 307, 319 (1979)). Though the trier of fact must "determine the credibility of witnesses, [ ] weigh their testimony, [ ] resolve conflicts in the evidence, and [ ] draw reasonable inferences from the evidence," *People v. Williams*, 193 Ill. 2d 306, 338 (2000), a factfinder's decision "is not conclusive and does not bind the reviewing court." *Cunningham*, 212 Ill. 2d at 280.

¶ 29    To secure a conviction, the State must prove Carswell "knowingly possess[ed] on or about his person *** any firearm or any firearm ammunition [having] been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2018). Carswell argues that the evidence was insufficient to show he knowingly possessed the handgun.

¶ 30    Carswell did not have actual possession of the gun. Still, he may have constructively possessed it "where there is no actual, personal, present dominion over contraband, but [he] had knowledge of the presence of the contraband, and had control over the area where the contraband was found." *People v. Hunter*, 2013 IL 114100, ¶ 19. "Knowledge may be proven by evidence of

a defendant's acts, declarations or conduct from which it can be inferred he knew the contraband existed in the place where it was found." (Internal quotation marks omitted.) *People v. Faulkner*, 2017 IL App (1st) 132884, ¶ 39. "Control is established when a person has the intent and capability to maintain control and dominion over an item, even if he lacks personal present dominion over it." (Internal quotation marks omitted.) *Id.*

¶ 31    We acknowledge that Carswell admitted the gun belonged to him after Lynch Mirandized him. But "law of Illinois requires proof of two distinct propositions or facts beyond a reasonable doubt: (i) a crime occurred (the *corpus delicti*); and (ii) the person charged committed the crime. *People v. Sargent*, 239 Ill. 2d 166, 183 (2010). "In general, the *corpus delicti* cannot be proven by a defendant's admission, confession, or out-of-court statement alone." *People v. Lara*, 2012 IL 112370, ¶ 17. "When a defendant's confession is part of the *corpus delicti* proof, the State must also provide independent corroborating evidence." *Id.* Importantly, the corroborating evidence must tend to show "the commission of a *crime*." (Emphasis added) *Id.*, ¶ 18.

¶ 32    The sole evidence the State presented that could even come close to corroborating Carswell's statement involves his reaching towards the seat as Henderson pulled over. Lynch's observations, however, do not corroborate Carswell's confession because Lynch admitted he could not see anything in Carswell's hands even though he had an unobstructed view of his hands. This testimony differs markedly from the corroborating evidence in *Lara*, where the defendant's alleged victim gave a detailed statement "virtually identical" to defendant's confession. *Id.*, ¶ 57. We do not imply, as the State suggests we did in its petition for rehearing, that "virtually identical" evidence is the *standard*; we point out that language only to highlight the difference between

Lynch's testimony—which directly contradicts, rather than corroborates, the existence of a crime—and the strength of the corroboration in *Lara*.

¶ 33    We are not persuaded otherwise by the dissent's reliance on *People v. Hannah*, 2013 IL App (1st) 111660, and *People v. Pitts*, 2016 IL App (1st) 132205. We start with *Pitts*, which is readily distinguishable. There, officers executed a search warrant and found two guns and ammunition in the rear first floor bedroom of a house. *Id.*, ¶ 15. Officers also found mail, a commercial driver's license, and a State identification card with the defendant's name and address on them matching the address on the warrant. *Id.*, ¶¶ 12-13. The defendant also told officers that the bedroom in the "back" of the house was his. *Id.*, ¶ 13. This court found "proof of defendant's residence" coupled with his later admission sufficient to prove the *corpus delicti* of the offense. *Id.*, ¶ 34.

¶ 34    Carswell did not own or have control over the car in which he rode. The car belonged to someone Henderson knew, Henderson was driving, and Henderson provided the officers with registration and insurance when officers pulled the car over. Carswell's mere presence in a car belonging to someone else does not tend to prove he had knowledge of (let alone control over) the gun. See *e.g., People v. Horn*, 2021 IL App (2d) 190190, ¶ 40 ("An individual's mere presence in a vehicle where contraband is found is insufficient to establish knowledge of the contraband.") Taking Carswell's lack of control together with Lynch's express testimony that he did not see anything in Carswell's hands defeats any tendency to show possession beyond Carswell's post-arrest admission.

¶ 35    In its petition for rehearing, the State presents Lynch's testimony as "far more" evidence of corroboration than mere presence, accusing us of "blithely impugn[ing]" his credibility. But

taking Lynch at his word is exactly the problem—he did not see a gun in Carswell's hands when Carswell moved towards the backseat, despite having an unobstructed view of him. It bears repeating this testimony directly contradicts, rather than corroborates, Carswell's confession.

¶ 36     For similar reasons, we do not agree with the dissent's reliance on *People v. Smith*, 2015 IL App (1st) 132176, because (as emphasized by the dissent in the case) mere presence near contraband where no one saw the defendant interact with the contraband does not corroborate a confession. *Id.*, ¶ 56-57 (Hyman, J. dissenting) ("Critically, [the officer] never actually saw any bag [containing contraband] with or near [the defendant].").

¶ 37     The dissent's reliance on *Hannah* does not persuade us either. In *Hannah*, officers executed a search warrant and found the defendant, a woman, and a young child sitting on a bed in the apartment's only bedroom. *Hannah*, 2013 IL App (1st) 111660, ¶ 29. We found "the fact that the defendant was seated on the bed where the handgun was hidden made it immediately accessible to the defendant." *Id.* Carswell was not in similarly immediate proximity to the gun and, we emphasize again, Lynch expressly disclaimed seeing anything in Carswell's hands when he reached toward the back seat. In a car where at least one person was closer to the gun than Carswell and no one saw Carswell with the gun, the remaining evidence does not tend to corroborate Carswell's confession.

¶ 38     Maybe, as the dissent suggests, Carswell's gun-free movement toward the backseat suggests he had immediate control over the area in the sense that he could physically reach it. The dissent, however, repeatedly elides that his control must have also been "exclusive." *People v. Faulkner*, 2017 IL App (1st) 132884, ¶ 39. Carswell did not own the car and Moore was closer to the gun, rendering this case quite unlike *Faulkner* where the defendant's apartment had direct

access to an attic where officers found a gun and the only other person who lived in the apartment building would not have been physically able to get to the attic. *Id.*, ¶ 42. The only evidence we have in the record suggests that Carswell did *not* put the gun where officers found it when he moved toward the backseat, which eliminates any inference that he had *exclusive* control over the gun or the area where officers found it.

¶ 39     The State aptly, and insistently, reminds us that the standard for reviewing a challenge to proof of the *corpus delicti* requires some evidence tending to show the commission of a crime. Fine. There is *no* affirmative evidence, leaving us with Lynch's self-contradictory account of the stop. Solely the presence of a gun in the car does not tend to show *Carswell* had knowledge and control over the gun, and Lynch's testimony suggesting Carswell made a movement toward the gun expressly disavows seeing a gun in his hand. The State failed to corroborate Carswell's confession with any evidence and, therefore, failed to establish the *corpus delicti* of the offense.

¶ 40     The dissent emphasizes the deference we owe to the finder of fact when they have assessed a witness's credibility. We have no quarrel with those reminders so far as they go. But, even as a reviewing court exercising considerable deference, we are not obliged to turn a blind eye to witness testimony that contradicts the State's version of events to the point of destroying the link between Carswell's confession and the evidence purportedly corroborating it. See *infra*, ¶ 44 (quoting *Cunningham*, 212 Ill. 2d at 280 ("the fact finder's decision to accept testimony is entitled to great deference *but is not conclusive and does not bind the reviewing court*.") (Alternative emphasis added)).

¶ 41     The dissent also emphasizes the trial court's role as arbiter of credibility, citing *People v. Carter*, 2021 IL App (4th) 180581. There, the Fourth District said, "Identical words can have vastly

different meanings based solely on the speaker's tone, body language, or both." *Id.*, ¶ 71. The dissent can only rely on these words by completely unmooring them from the context in which they were written. The court discussed the concept of "paralanguage" as part of oral testimony; paralanguage includes demeanor, body language, tone, and effect on the listener. *Id.*, ¶ 70. The court concluded that deference to the finder of fact on issues of credibility is essential because only they can evaluate these paralinguistic features of oral testimony. But, in *Carter* the trial court had directly linked its credibility determinations to aspects of the witness's testimony quite distinct from the substance. *Id.*, ¶ 66 (trial court disbelieved one witness because he was hard to understand, disbelieved the defendant because he was "argumentative," and disbelieved another witness because he was "evasive.").

¶ 42     The Fourth District's admonishment about deference has no place here. Our evaluation of Lynch's testimony has nothing to do with his demeanor. The substance of his testimony, which we can evaluate just as ably from a paper record as the trial court could in person, renders it incapable of corroborating Carswell's confession. As we mentioned already, the only way Lynch's testimony could corroborate Carswell's confession is if we decided we *didn't* believe him when he said he did not see a gun in Carswell's hand. Our deference to the trial court does not require us to ignore the words a witness spoke, memorialized in the record before us.

¶ 43     Moreover, *Carter*'s insistence that appellate courts are less able to assess credibility does not enjoy universal support. Indeed, some of the very same paralinguistic features emphasized by the court in *Carter* can diminish the trial-level factfinder's ability to accurately assess information. See Chad M. Oldfather, *Appellate Courts, Historical Facts, and the Civil-Criminal Distinction*, 57 Vand. L. Rev. 437, 453 (2004) ("oral language encourages an intuitive and emotional thought

process in its hearers" and is poorly suited for "abstract and logical expression"). Not to mention, the fast-paced nature of witness testimony only exacerbates the "limitations on human ability to hold orally communicated information in memory." See *id.* at 454. Many of the features of witness testimony the court in *Carter* so prized can, in reality, frustrate rather than improve the truth finding endeavor of a criminal trial. *Id.* ("some of the additional texture to which the fact finder is exposed, such as witness demeanor, might actually operate to mislead, and thereby to impede the fact-finding process."). Our ability to dispassionately evaluate a written record may provide us a "competency advantage" leading to "more accurate fact finding." *Id.* We disagree with *Carter* to the extent the dissent reads it as a broad statement against our duty to closely examine the evidence any time a sufficiency claim arises.

¶ 44    We take *Cunningham* seriously when it gives us the authority to unbind ourselves from the trial court's findings of fact. It is absurd to suggest that we must turn a blind eye to blatantly contradictory testimony simply because we were not present to hear it with our ears. Lynch's testimony does not tend to corroborate Carswell's confession, whether he spoke marble-mouthed with shifty eyes or in clarion English with utmost confidence. Our criminal legal system would not be well-served were we to ignore Lynch's contradictions under the guise of judicial deference.

¶ 45    Reversed.

¶ 46    JUSTICE COGHLAN, dissenting:

¶ 47    Here, through Officer Lynch's testimony, the State offered sufficient corroborating evidence—independent of Carswell's statements—tending to prove the commission of UUW by a felon. Lynch testified that he observed the defendant, who was seated in the front passenger seat, "make rapid movements with his whole body, including his hands towards the rear seat located

directly behind the front passenger seat." Lynch did not have to move or touch anything to observe "what [he] immediately recognized to be the barrel or the slide and barrel of a handgun" located in the backseat of the vehicle at the bottom of a child safety seat. Lynch's testimony that he personally observed Carswell making movements with his body and hands that were consistent with "the location of where [he] found the firearm" established Carswell's connection to the offense. This testimony was independent evidence tending to inspire belief in Carswell's admission that he owned the gun found in the vehicle. See *People v. Hannah*, 2013 IL App (1st) 111660, ¶¶ 29, 31 (noting "slight level of evidence necessary to establish *corpus delicti*").

¶ 48   Although Lynch admittedly never saw a gun in Carswell's hands, the trial judge found Lynch was "the most credible witness that [testified] at trial" and "[a] quick search finds this gun right where Mr. Carswell made this gesture." In *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004), our supreme court "*reaffirm[ed] that the fact finder's decision to accept testimony is entitled to great deference* but is not conclusive and does not bind the reviewing court." (Emphasis added.) The court also emphasized that "it is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *Id.* at 283; see also *Sparling v. Peabody Coal Co.*, 59 Ill. 2d 491, 498-99 (1974) (stating that the "rule in this State and generally is that the contradictory testimony of a witness does not per se destroy the credibility of the witness or the probative value of his testimony, and it remains for the trier of fact to decide when, if at all, he testified truthfully.")

¶ 49   In addition to defendant's confession, the evidence established that a gun was recovered from a vehicle in which the defendant was a passenger, from a location consistent with "movements [officer Lynch] observed from the defendant." An experienced trial judge

"determine[d] the credibility of the witnesses," weighed "their testimony," resolved "conflicts in the evidence," and "drew reasonable inferences from the evidence." See *People v. Williams*, 193 Ill. 2d 306, 338 (2000). It is not the function of this court "to second-guess the trial court based on our own interpretation of the testimony contained in a cold record." *People v. Carter*, 2021 IL App (4th) 180581, ¶ 74.

¶ 50    In *Hannah*, the court found that the State established the offense of unlawful possession of a weapon by a felon through the recovery of a handgun underneath a mattress on a bed in which defendant and another adult had been sitting. 2013 IL App (1st) 111660, ¶¶ 27, 29. We found that "the *corpus delicti* of the offense was established through both the recovered handgun and the defendant's incriminating statement" to police. *Id.* ¶ 29. "The fact that the defendant," who did not reside in the home, "was seated on the bed where the handgun was hidden made it immediately accessible to [him] at the time police executed the search warrant." *Id.* While defendant did not have "exclusive" control over the gun because both he and the woman were sitting on the bed, we found that "these facts suggest that he had *immediate* control over the area where the handgun was found." (Emphasis in original.) *Id.* We determined that this fact tended to show that the defendant, unlawfully possessed the weapon. *Id.* Similarly, the fact that Carswell was seated within arm's reach of the location where Lynch found the firearm made it immediately accessible to him. While Carswell did not have "exclusive" control over the gun because there were other passengers in the car, "these facts suggest that he had *immediate* control over the area where the handgun was found." (Emphasis in original.) See *id*. Control over this area "gives rise to an inference" that Carswell possessed the gun. *People v. Faulkner*, 2017 IL App (1st) 132884, ¶ 39. " 'Knowledge

and possession are questions of fact to be resolved by the trier of fact ***.' "*Id.* (quoting *People v. Luckett*, 273 Ill. App. 3d 1023, 1033 (1995)).

¶ 51    In *People v. Smith*, 2015 IL App (1st) 132176, ¶¶ 20-21, we found that "[t]he State offered sufficient independent evidence" of the offense of AUUW by a felon by "demonstrat[ing] that [the defendant] *** sat on the bus in close proximity to where a gun was found" concealed in a bag, tending "to show the commission of AUUW." Relying on *Hannah*, we emphasized that " 'only a slight level of evidence [is] necessary to establish the *corpus delicti*' " and that the State had met that "minimal threshold." *Id.* ¶ 21 (quoting *Hannah*, 2013 IL App (1st) 111660, ¶ 29).

¶ 52    In finding that there was sufficient evidence to "corroborate defendant's confession that the guns in his home belonged to him," in *People v. Pitts*, 2016 IL App (1st) 132205, ¶ 3, we again emphasized that "the evidence corroborating defendant's confession does not need to be particularly compelling or strong." *Id.* ¶ 37. In *Pitts*, "the evidence *** that defendant, a felon, lived in the home where guns were found" was "enough to *tend* to show that he possessed the firearms" and "to corroborate defendant's admission that he owned the firearms." (Emphasis in original.) *Id.* ¶¶ 37-38.

¶ 53    Even viewed in the light most favorable to the State, the majority finds that "Carswell's lack of control together with Lynch's express testimony that he did not see anything in Carswell's hands defeats any tendency to show possession beyond Carswell's post-arrest admission." However, "[i]dentical words can have vastly different meanings based solely on the speaker's tone, body language, or both." *Carter*, 2021 IL App (4th) 180581, ¶ 71. In other words, "[j]udging whether someone is testifying truthfully, fully, honestly, and earnestly is nigh impossible from the mere words on a page." *Id.*

¶ 54    It is not our function to retry the defendant when considering the sufficiency of the evidence. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). "[A] reviewing court will not substitute its judgment for that of the trier of fact on issues of the weight of the evidence or the credibility of witnesses." *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). The majority reassesses the credibility of Officer Lynch (without having had the opportunity to observe him testify) by characterizing his testimony as a "self-contradictory account of the stop." The trial judge found nothing improbable about Carswell being "standup enough to take responsibility for his contraband" in order to protect "his girlfriend and Mr. Henderson who had nothing to do with this." See *id.* at 432 (finding "no basis for rejecting the trial court's finding that the State's witnesses were credible and corroborated one another").

¶ 55    Where, as here, "a defendant's confession is part of the *corpus delicti* proof, the State must also provide independent corroborating evidence" which "*tend[s] to show* the commission of a crime." (Emphasis in original.) *People v. Lara*, 2012 IL 112370, ¶¶ 17-18. Officer Lynch's observations of Carswell's movements prior to stopping the vehicle were consistent with the area where he found the gun and sufficiently corroborated Carswell's confession to satisfy the *corpus delicti* rule.

¶ 56    I do not find the evidence in this case to be "so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt" to warrant reversal. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). Accordingly, I respectfully dissent and would affirm the conviction.