2022 IL App (1st) 211417-U

SECOND DIVISION
December 13, 2022

No. 1-21-1417

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 07 CR 08965 (02) |
| BRYAN ESTRADA, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Ursula Walowski, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Ellis concurred in the judgment.

**O R D E R**

¶ 1    *Held*:    The circuit court properly denied the petitioner's postconviction petition after a third-stage evidentiary hearing. The court did not utilize an improper standard in denying the petitioner's actual innocence claim.

¶ 2    After a jury trial in the circuit court of Cook County, the petitioner, Bryan Estrada, was

convicted of first-degree murder, attempted first degree murder, and aggravated discharge of a

firearm and sentenced to 80 years' imprisonment. The petitioner now appeals from the third-stage dismissal of his *pro se* petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)). He contends that the circuit court used an improper standard in denying his actual innocence claim because the newly offered evidence made it more probable than not that a jury would reach a different result at trial. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4       The record before us reveals the following relevant facts and procedural history. In 2007, together with codefendants Rufino Castillo (Rufino) and James Castillo (James), the petitioner was charged with first degree murder (720 ILCS 5/9-1(a)(1)-(2) (West 2006)), attempted first degree murder (720 ILCS 5/8-4(a) (West 2006)), aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)), and unlawful use of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2006)) for his involvement in the March 25, 2007, drive-by-shooting, which resulted in the death of Luis Villegas (Villegas), and serious injury to Edgar Martinez (Edgar).

¶ 5       The petitioner was tried together with Rufino before separate juries. James' charges for first degree murder were dropped and he subsequently pleaded guilty to concealing and aiding a fugitive in exchange for his testimony at the petitioner's trial.

¶ 6       Because the evidence adduced at that trial is set forth fully in our decision following the petitioner's direct appeal (*People v. Estrada*, 2012 IL App (1st) 100265-U), we only summarize the relevant evidence here.

¶ 7       That evidence reveals that on March 25, 2007, Edgar drove his SUV to a car parts store with his father and his best friend, Villegas. On the way home from the store, Edgar saw a red car with Rufino and Rufino's brother James, whom he knew well from the neighborhood. Edgar did not see anyone else inside the red car.

2

¶ 8    After dropping his father at home, Edgar and Villegas, who had no weapons, drove off looking for Rufino and James to "mess with them," *i.e.*, "just talk crap to them *** like fight them. Start trouble with them ***." Edgar explained that he and Villegas were members of the Spanish Gangster Disciple street gang and that Rufino and James were members of the rival Imperial Gangsters.

¶ 9    Edgar was driving east through an alley between North Lawndale and North Monitcello Avenues, when he encountered the red car again. Edgar saw four individuals inside the red car and immediately recognized James and Rufino. James was driving, Rufino was in the passenger seat, and two other individuals were in the back.

¶ 10    When Edgar stopped his own vehicle, Villegas "threw gang signs" at the red car and the occupants of the red car responded by "throwing gang signs" back. At that point, an individual, whom Edgar later identified as the petitioner, exited the back seat on the driver's side of the red car, pulled out an automatic handgun, and began shooting in Edgar's direction. The petitioner was the only person who exited either vehicle during the shooting.

¶ 11    Edgar drove off and stopped after two blocks only to make sure that Villegas, whose window was down, was ok. He then realized that a bullet had hit Villegas in the back of the head. After Edgar called 911, the police arrived and spoke to Edgar at the scene. Edgar told them that he saw James and Rufino inside the red car and then described the shooter to them as being between 5'5" and 5'7", 150 lbs., and with a "fade" haircut. Edgar then accompanied detectives to the police station, where he identified James and Rufino from a photo array.

¶ 12    The next day, the police contacted Edgar and brought additional photographs to his home. Edgar identified the petitioner from the photo array as the shooter. That same day, he returned to the police station and identified Rufino in a lineup. A few days later, he identified the

petitioner from another lineup.

¶ 13    On cross-examination, Edgar acknowledged that he recognized the petitioner from the neighborhood. He stated that although he did not know the petitioner's name, two of his younger brothers, who were members of the Imperial Gangsters, were friends with the petitioner and he had picked them and the petitioner up from high school in the past. Edgar, acknowledged, however that he never told the police that he was familiar with the petitioner or that the shooter was someone his younger brothers knew and who used to come to their house.

¶ 14    In addition, Edgar could not remember telling the police that the shooter had "slick black hair."

¶ 15    Chicago Police Officer Eron Glascott next testified that he was the first to respond to the scene of the crime on March 25, 2007. Once there, he observed Edgar, who was covered in blood, standing next to a black SUV and Villegas sitting in the passenger seat, unresponsive, and with a bullet wound at the front of his left eye. After speaking to Edgar, Officer Glascott learned where the shooting took place and contacted the dispatcher to indicate that there was another crime scene.

¶ 16    On cross-examination, Officer Glascott admitted that Edgar did not give him the shooter's name, and that he initially described the shooter as a male Hispanic.

¶ 17    Chicago Police Detective Steven Suvada next testified that together with his partner Mark Pawelski he spoke to Edgar at the scene of the crime. According to Detective Suvada, at that time, Edgar identified James and Rufino by name and described the shooter as a Hispanic male with a "fade haircut," between 5'4" and 5'7". That same afternoon, Edgar accompanied the detectives to the police station, where he viewed a photo array and identified James as the driver of the red car and Rufino as the front seat passenger.

¶ 18    On the following day, Detective Suvada located the red car that was used in the shooting, and arrested Rufino. Later that same evening he proceeded to Edgar's home and showed him another photo array, from which Edgar identified the petitioner as the person who shot Villegas.

¶ 19    On March 28, 2007, Detective Suvada arrested the petitioner and Carlos Vasquez (Carlos). That afternoon, Edgar returned to the police station to view a physical lineup which included both the petitioner and Carlos. Edgar identified the petitioner as the individual who shot Villegas. He did not identify anyone else in the lineup. The detective did not tell Edgar whom to pick out of the lineup but did tell him that he had found a person he believed to be the shooter.

¶ 20    On cross-examination, Detective Suvada acknowledged that Edgar never informed him that he knew the petitioner. He also stated that it was his understanding that Carlos was the fourth person in the red car, but that Carlos was never charged in connection with the shooting.

¶ 21    On cross-examination, Detective Suvada also acknowledged that the photo array from which Edgar identified the petitioner contained a photograph of a person named Manuel, who had slick hair. The detective also verified that "IG Chino" was written on the back of that photograph, underneath Manuel's name, but testified that neither the detectives nor Edgar wrote that notation. Detective Suvada did not know who did. The detective also denied that Edgar ever described the shooter to him as having slick hair.

¶ 22    The State next called James, who acknowledged that he was originally charged with first degree murder in the instant case but explained that the charges were dropped in exchange for his testimony and a guilty plea (with a sentence of probation) to the offense of aiding a fugitive.

¶ 23    James testified that from the late 1990s into early 2000, the petitioner was his neighbor. After that, they had had no contact prior to March 25, 2007. On that day, Rufino was using his girlfriend's red car to drive James to the Metra train station, when the petitioner telephoned

James and asked him if he wanted to "go cruising." The petitioner was at a nearby carwash, so Rufino drove there. Afterwards, he followed the petitioner and another man, whom James only knew as "Carlos" to Avondale. There, the petitioner and Carlos abandoned their vehicles and got into the red car with James and Rufino. Because Rufino was tired, James took over driving. When the others got into the red car, the petitioner sat behind James on the driver's side, and Carlos sat behind Rufino.

¶ 24    James drove around the neighborhood for about 30 to 45 minutes before ending up in an alley between Lawndale and Monticello Avenues. As he was heading down the alley, his path was blocked by a dark SUV. James saw the passenger door on the SUV crack open a little. After that he heard gunshots coming directly from behind him. James stated that he went down for cover, heard the door behind him close, and knew immediately that the petitioner was the shooter. James testified that he did not see anyone flashing any gang signs from either vehicle before the shooting. After the shots were fired, the petitioner started shouting at James to get out of there, so he drove off. James pulled over somewhere on Fullerton Avenue to allow Carlos and the petitioner to get out of the car. Rufino then dropped James off at the train station.

¶ 25    On cross-examination, James confirmed that he did not see either the actual shooting or the gun used. He also admitted that he did not go to the police with this information until a year-and-a half after the shooting. He explained, however, that he had had no contact with his family in the meantime and therefore had no idea that his brother had been arrested.

¶ 26    On cross-examination, James further acknowledged that he did not see Edgar on the day of the shooting. He explained that when he saw the black SUV in the alley, he could not see who was inside the vehicle, and believed that the windows on the SUV were closed.

¶ 27    The parties next stipulated that during his interview with Cook County Assistant State's

Attorneys, James was asked whether the petitioner was in a gang and responded that the petitioner was an "IG."

¶ 28    The evidence at trial further established that police officers found no weapons inside Edgar's SUV but recovered four fired shell casings and a metal fragment in the alley, and a shell casing from inside the red car, which was impounded after Rufino's arrest. Forensic testing found that the shell casings from the scene and the red car were all .380 caliber and had been fired from the same gun.

¶ 29    The evidence at trial further established that Villegas died as a result of a gunshot wound to the back of his head, which exited through his left eye.

¶ 30    After the State rested, the defense called Detective Pawelski, who acknowledge that when he spoke to Edgar at the scene of the crime, Edgar gave him a description of the shooter, which he wrote down in his notes. After being shown his notes, the detective acknowledged that he had written that the shooter had slick hair. While Detective Pawelski could not remember who told him that the shooter had slick hair, he testified that it was not Edgar.

¶ 31    On cross-examination, Detective Pawelski averred that the notes with the description of the shooter as having slick hair were not from an interview of any specific person. He testified that the report for his interview with Edgar did not mention slick hair. After he wrote the general reports, Detective Pawelski stated that he prepared a supplementary report and, in that report, he noted that the shooter had a "fade haircut."

¶ 32    On redirect, Detective Pawelski acknowledged that this supplementary report was prepared a couple of days after the incident. He acknowledged that none of his handwritten notes contained a reference to "a short, fade haircut," and that the supplementary report was the first document that mentioned such a haircut.

¶ 33    During closing, defense counsel argued that the petitioner was not the shooter. Counsel pointed out that the initial description of the shooter did not match the petitioner, and that while Edgar knew the petitioner through his brothers, he did not immediately identify him to the police. Counsel further argued that the photo array evidence suggested that Edgar identified someone other than the petitioner as the shooter.

¶ 34    After deliberations, the jury found the petitioner guilty of first-degree murder, attempt first-degree murder, and aggravated discharge of a firearm. The circuit court subsequently sentenced the petitioner to 80 years' imprisonment.

¶ 35    The petitioner appealed his conviction, arguing, *inter alia*, that the State had failed to prove him guilty beyond a reasonable doubt where the only evidence linking him to the crimes consisted of testimony from two eyewitnesses who provided conflicting, impeached, and unbelievable testimony. *People v. Estrada*, 2012 IL App (1st) 100265-U.

¶ 36    On March 26, 2013, the petitioner filed his first *pro se* postconviction petition, arguing that he received ineffective assistance of counsel because counsel failed to call Carlos as a witness at his trial. The circuit court dismissed the petition on May 29, 2014, and we affirmed that dismissal on March 23, 2016. *People v. Estrada*, 2016 IL App (1st) 141806-U.

¶ 37    On May 14, 2019, the petitioner filed the instant successive postconviction petition. Therein, he raised a claim of actual innocence based on newly discovered evidence in the form of three affidavits from: (1) his sister, Virginia Estrada (Virginia); (2) Carlos; and (3) Miguel Ruiz (Ruiz).

¶ 38    On March 9, 2021, the circuit court denied the State's motion to dismiss the petition and advanced the petition to the third stage of postconviction proceedings. On September 9, 2021, the circuit court held an evidentiary hearing at which the following testimony was heard.

¶ 39 The petitioner's sister, Virginia, testified with the help of a Spanish interpreter. She stated that on March 25, 2007, she was pregnant and living at 4520 South Keating Avenue in Chicago with her husband and son. Virginia stated that starting at around 2:30 p.m. on that day, the petitioner and Carlos were at her house for more than an hour. According to Virginia, at about 2:30 p.m. the petitioner took a shower after which she sent him to the store for milk. When asked if she was looking at a clock to confirm the exact timing of events, Virginia answered in the affirmative, noting that she was looking at the clock because she was waiting on her husband. Virginia further stated that she contacted the petitioner's attorney regarding her willingness to testify but he never called her as a witness at the petitioner's trial.

¶ 40 Carlos next testified that he and the petitioner have been best friends since childhood and that they are both members of the Imperial Gangsters. At about 12 p.m. on March 25, 2007, Carlos received a telephone call from the petitioner asking him if he wanted to meet up with some girls. Carlos agreed to meet the petitioner at a car wash on Lawrence and Cicero Avenues. Carlos averred that while there, James and Rufino drove by, drinking, and asked them if they wanted to "hang out" in the neighborhood. Carlos and the petitioner refused because they wanted to meet up with the girls near Virginia's house.

¶ 41 The petitioner then drove Carlos to Virginia's house. They arrived there at about 2:30 or 3 p.m. and remained there for well over an hour. Carlos remembered that Virginia was pregnant and that at some point the petitioner left to go to the store.

¶ 42 Carlos testified that after their plans to meet the girls fell through, he and the petitioner went to "cruise around" and look for Carlos' brother near Fullerton Avenue. At about 5 or 6 p.m. they parked near Belden and St. Louis Avenues where they saw James and Rufino fighting each other in the middle of the block. According to Carlos, James and Rufino were cursing at each

other and one of them said, "what you did was stupid." Carlos and the petitioner separated the two brothers to stop them from fighting. While they held James, Rufino left in a red four-door car.

¶ 43   James stayed with Carlos and the petitioner and the three of them drove around for a while. They parted ways around 8 or 9 p.m., and the petitioner went home, while Carlos went to meet up with his brother.

¶ 44   Carlos admitted that he knew Edgar and that Edgar was a member of the Spanish Gangster Disciples. He stated that James was a Satan Disciple and Rufino a Spanish Cobra. He also admitted that he and the petitioner were Imperial Gangsters, and that the Imperial Gangsters were not friendly with the Spanish Gangster Disciples.

¶ 45   Carlos testified that he spoke with the petitioner's trial attorney six or seven times but was not called as a witness at his trial.

¶ 46   Ruiz next testified that he met the petitioner in prison in March 2019. Ruiz learned that the petitioner had been convicted of killing one of Ruiz's friends, "Lagrimas," whose real name Ruiz did not know. Ruiz testified that he was shocked that the petitioner was convicted for this crime because he was present during the shooting of "Lagrimas" on March 25, 2017, and knew that the petitioner was not the shooter.

¶ 47   According to Ruiz, on that day, he was with "Lagrimas" and "Happy," whom he also knew as Edgar. Ruiz, "Happy" and "Lagrimas" were all members of the Spanish Gangster Disciples. At about 3 p.m., on March 25, 2007, Edgar picked up Ruiz, and the three of them drove around the neighborhood. Edgar was behind the wheel, "Lagrimas" was in the front passenger seat, and Ruiz sat in the back. Sometime later, they saw a red car in the alley between Monitcello and Lawndale Avenues, and Edgar stopped the car. When "Lagrimas" started

throwing gang signs at the red car, an individual from the front passenger seat of the red car got out and started walking towards them. The person was 5' 7" or 5' 8" with slicked black hair and wore a black shirt and blue jeans. The person began shooting at them, so Edgar drove off, and Ruiz realized that "Lagrimas" was dead. Ruiz affirmatively testified that the petitioner was not the shooter. Once they reached Central Park Avenue and Ainslie Street, Ruiz got out of the car and went home because Edgar was going to call the police. Ruiz stated that he was never questioned about the shooting.

¶ 48　On cross-examination, Ruiz admitted that he was convicted for murder in 2011 and was serving a 45-year sentence when he met the petitioner.

¶ 49　On cross-examination, Ruiz also admitted that he did not make any attempt to find out if the police had arrested anyone in connection with the shooting. He also stated that "Lagrimas" was hit with a bullet in the right side of his head, and that he did not see any blood on Edgar.

¶ 50　After hearing the testimony of the three witnesses, the circuit court denied the petition. In doing so, the court found all three witnesses lacked credibility. Specifically, with respect to Ruiz, the court found unbelievable that Ruiz was present during the shooting but failed to say or do anything about it until he met the petitioner in prison in 2019, particularly since there was no evidence offered at trial to corroborate the fact that he was inside the SUV with Edgar and Villegas. As the court concluded: "[His] testimony, listening to it, when I look at a person's credibility how they testified, the reasonableness of their testimony, I do not find *** Ruiz credible at all."

¶ 51　The court similarly found Virginia's testimony lacking. The court called into question her ability to remember 14 years after the incident that for thirty minutes to an hour, right at the time of the shooting, her brother had been at her house. As the court explained: "He might have been

11

there at some point. I don't—I am not saying that [Virginia] is lying about her brother being there, but once again, I don't find that this is a valid alibi is a credible alibi for purposes of the trial when I take, once again, the testimony as a whole of everything."

¶ 52    Finally, the court found Carlos' testimony that he was not present during the shooting unbelievable because evidence at the petitioner's trial established that he was the fourth passenger inside the red car. In addition, the court found that Carlos had a motive to lie and pin the murder on James and Rufino. As the court stated: "When I look at the testimony as a whole, I do not find *** Carlos credible that he was not there and [that the petitioner] did not do the shooting."

¶ 53    The petitioner now appeals.

¶ 54                                    II. ANALYSIS

¶ 55    On appeal, the petitioner contends that the circuit court erred in denying his postconviction petition after the evidentiary hearing. He argues that the circuit court used an improper standard in denying his actual innocence claim because the newly offered evidence made it more probable than not that a jury would reach a different result at trial. For the following reasons, we disagree.

¶ 56    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et. seq.* (West 2018)) provides a mechanism by which a convicted defendant may assert a substantial deprivation of his or her federal or state constitutional rights in the proceedings that led to the conviction. *People v. Edwards*, 2012 IL 111711, ¶ 21; *People v. Tate*, 2012 IL 112214, ¶ 8; see also *People v. Walker*, 2015 IL App (1st) 130530, ¶ 11 (citing *People v. Harris*, 224 Ill. 2d 115, 124 (2007)).

¶ 57    The Act provides a three-step procedure for postconviction relief. *People v. English*, 2013 IL 112890, ¶ 23. At the first stage, the circuit court must independently review the petition, taking the allegations as true, and determine whether " 'the petition is frivolous or patently without merit.'

12

" *People v. Hodges*, 234 Ill. 2d 1, 10 (2009) (quoting 725 ILCS 5/122–2.1(a)(2) (West 2006)); see also *Tate*, 2012 IL 112214, ¶ 9. If the petition survives the first stage, the proceeding advances to the second stage where counsel is appointed and granted leave to amend the petition into an appropriate legal form. *Tate*, 2012 IL 112214, ¶ 10; see also *People v. Turner*, 187 Ill. 2d 406, 416-17 (1999). At this stage, the circuit court must determine whether the petition and any accompanying documentation make a "substantial showing" of a constitutional violation. *Tate*, 2012 IL 112214, ¶ 10. If no such showing is made, the petition is dismissed. *Id.*

¶ 58    However, if a substantial showing is set forth, the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing to determine the validity of the petition's factual allegations. *Id.*; see also 725 ILCS 5/122-6 (West 2018). At this stage, unlike the previous ones, the petitioner's allegations are not presumed to be true, and the petitioner must prove his claim by a preponderance of the evidence. *People v. Domagala*, 2013 IL 113668, ¶ 35; *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006); *People v. Childress*, 191 Ill. 2d 168, 174 (2000); *People v. Carter*, 2017 IL App (1st) 151297, ¶ 132.

¶ 59    During the evidentiary hearing, the circuit court, has wide discretion in deciding what evidence to consider. *People v. Williams*, 2017 IL (App) (1st) 152021, ¶ 22. Moreover, because it is in the best position to observe the demeanor of the testifying witnesses, the circuit court, as the fact finder, is vested with the responsibility of making credibility determinations, resolving conflicting testimony and weighing the evidence offered. *Domagala*, 2103 IL 113688, ¶ 34; *People v. Reed*, 2020 IL 124940, ¶ 51.

¶ 60    In reviewing the dismissal of a petition after a third-stage evidentiary hearing, we may not reverse the circuit court's decisions regarding credibility determinations or fact-finding unless they are manifestly erroneous. *Pendleton*, 223 Ill. 2d at 473; *English*, 2013 IL112890, ¶

23. Manifest error is error that is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *People v. Coleman*, 2013 IL 113307, ¶ 98. Accordingly, a decision is manifestly erroneous only when the opposite conclusion is clearly evident. *Id.*

¶ 61    In the present case, after the evidentiary hearing, the circuit court dismissed the petitioner's actual innocence claim. It is axiomatic that to succeed on such a claim the petitioner was required to establish by a preponderance of the evidence offered at the hearing that his evidence was: (1) newly discovered; (2) material and not merely cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; *People v. Sanders*, 2016 IL 118123, ¶ 24 (citing *Edwards,* 2012 IL 111711, ¶ 32). Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47; *Coleman*, 2013 IL 113307, ¶ 96. Material means that the evidence is relevant and probative of the petitioner's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Noncumulative means that the evidence adds to the information that the jury heard at trial. *Id.* Lastly, conclusive means that the new evidence, when considered along with the trial evidence, would probably lead to a different result. *Id.* ¶ 96. While the "conclusive character" of the evidence is the most important element of an actual innocence claim, all three prongs of the test must be satisfied, and a petitioner's failure to establish a single prong will be fatal to his actual innocence claim. See *Id.* ¶ 47; *Sanders*, 2016 IL 118123, ¶ 47.

¶ 62    In the present case, the petitioner contends that in denying his petition the circuit court applied the incorrect standard for examining the conclusiveness element of his actual innocence claim. The petitioner asserts that the court incorrectly applied a total exoneration standard instead of considering whether, when considered together with the evidence offered at his trial, the

testimony of Virginia, Ruiz, and Carlos had the probability of undermining the jury's finding of guilt.

¶ 63    The petitioner is correct that under our supreme court's more recent holding in *Robinson,* 2020 IL 123849, ¶ 85, the conclusive character of the new evidence need not be completely dispositive of the petitioner's innocence. In *Robinson*, our supreme court explicitly rejected prior caselaw holding that the new evidence must either totally "vindicate" or "exonerate" the petitioner. *Id*. ¶¶ 48, 55-56. Instead, our supreme court held that "the conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 56. As the court explained:

> "The new evidence need not be entirely dispositive to be likely to alter the result on
> retrial. [Citation]. Probability, rather than certainty, is the key in considering whether the
> fact finder would reach a different result after considering the prior evidence along with
> the new evidence." *Id.*

¶ 64    In the present case, the petitioner does not point to any specific language in the circuit court's ruling that would support the conclusion that the court misapplied *Robinson*. Instead, he contends that the court's credibility determinations as to the three witnesses "imply" an improper application of the "exoneration" standard. We disagree.

¶ 65    As already noted above, as a reviewing court we may not second guess the credibility determinations of the circuit court unless they are manifestly erroneous. See *Reed*, 2020 IL 124940, ¶ 51. After reviewing the record, we are unable to say that the circuit court's credibility determinations regarding Ruiz, Carlos, and Virginia are manifestly erroneous, or that they somehow imply the court's misapplication of the standard articulated in *Robinson*. Rather, the

record reveals that the circuit court correctly considered the evidence offered by the three newly discovered witnesses in context of the evidence offered at the petitioner's trial and found that the three witnesses lacked credibility to such an extent that denial of the petition was warranted.

¶ 66     To being, with respect to Ruiz, the court noted that his testimony regarding being inside Edgar's SUV at the time of the shooting was directly contradicted by Edgar's own statements that he and Villegas were alone in the vehicle when the petitioner shot at them. The court pointed out that not a single piece of evidence offered at the petitioner's trial corroborated Ruiz's statements that he was present for the shooting. Moreover, the court found incredible that even though he observed the shooting of his friend, and could describe the shooter, Ruiz said nothing to the police or anyone else about it until he conveniently met the petitioner in prison 12 years after the fact. As the court stated: "His testimony, listening to it, when I look at a person's credibility how they testified, the reasonableness of their testimony, I do not find *** Ruiz credible at all."[1]

¶ 67     Similarly, with respect to Carlos, the circuit court found that his testimony regarding not being present during the shooting was directly contradicted by James' statement at trial that he was the fourth person inside the red car. In addition, trial evidence established that Carlos was arrested at the time of the shooting, and that the police agreed that he was the fourth passenger of the red car even though he was never charged. The circuit court therefore determined that Carlos was incredible because he was part of the case from the beginning but offered no information to the police exonerating the petitioner until the instant evidentiary hearing. Moreover, as the fourth person in the red car, Carlos, who was both a member of the same gang and a close friend of the

---

[1] We note that, while not explicitly mentioned by the circuit court, the trial record demonstrates additional flaws with Ruiz's testimony. His statement that Villegas suffered a gunshot wound to "the right side of [his] head" is directly contradicted by the testimony of both Officer Glascott and the medical examiner that the victim was shot in the back of the head and that the bullet came out of his left eye.

petitioner, had an interest in claiming he was not present at the shooting and pinning the crime on James and Rufino. As the court noted: "When I look at the testimony as a whole, I do not find *** Carlos credible that he was not there and [the petitioner] did not do the shooting."

¶ 68    Finally, with respect to the petitioner's sister, the court noted that while Virginia was not necessarily lying about the petitioner being at her home on the day of the shooting, it was highly unbelievable that 14 years later she should remember that he was in the shower for the exact 30 minutes when the shooting occurred. As the court noted: "I don't find that this is a *** credible alibi for purposes of the trial when I take, once again, the testimony as a whole of everything."

¶ 69    We find nothing manifestly erroneous in the court's assessment of the veracity of the three witnesses, and therefore have no reason to second-guess or overturn the circuit court's conclusion. From the record before us it is evident that the circuit court properly considered the new evidence in context of the entirety of the trial evidence focusing on "[p]robability, not certainty" in predicting what another jury would do. This is the correct standard for determining the conclusiveness of the petitioner's evidence in the context of an actual innocence claim. *Coleman*, 2013 IL 113307, ¶ 97. Accordingly, we conclude that the circuit court applied the proper standard and that dismissal of the petition after the evidentiary hearing was proper.

¶ 70    In reaching this conclusion, we have considered the decision in *People v. Treondous Robinson*, 2021 IL App (1st) 171371, cited to by the petitioner and find it inapposite. In that case, in its ruling denying the postconviction petition after an evidentiary hearing, the trial court stated that the witness's testimony "when weighed against the evidence presented at trial," fell short of "providing petitioner of the complete vindication and total exoneration that are the hallmarks of an actual innocence claim." *Id*. at ¶ 48. The trial court further found that there was no "basis to find that the outcome at trial could possibl[y] differ[] based on the incredible

17

account" offered by that witness.

¶ 71    Based on that language in the trial court's ruling, on appeal, we held that the trial court improperly employed the standard of total vindication or exoneration in contravention of our supreme court's ruling in *Robinson*. *Id.* We therefore reversed the trial court's ruling and remanded for a new evidentiary hearing. *Id.*

¶ 72    The instant case bears no resemblance to the facts of *Treondous Robinson*. The circuit court here made no overt or implied comments regarding the new evidence failing to "exonerate" or "vindicate" the petitioner. Instead, the court simply found the petitioner's evidence to be incredible. This is exactly what the court was vested with determining at this stage of postconviction proceedings. See *Domagala*, 2013 IL 113688, ¶ 34 (At the third-stage evidentiary hearing, "the circuit court serves as the fact finder, and therefore, it is the court's function to determine witness credibility, decide the weight to be given testimony and evidence, and resolve any evidentiary conflicts."); see also *People v. Coleman*, 183 Ill. 2d 366, 384 (1998) ("[T]he post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record.' " *Johnson v. Fulkerson,* 12 Ill. 2d 69, 75 (1957)); *People v. Carter*, 2021 IL App (4th) 180581, ¶ 68 ("Any time a trial court serves as a fact finder, perhaps the single most important thing the court can do is say whom it believes and whom it does not. When the trial court favors us with such a finding, we are at the height of our deference to that court.").

¶ 73    Since the petitioner here has failed to show that the court's credibility assessment of Ruiz's, Carlos', and Virginia's testimonies was manifestly erroneous, we are unable to conclude

that the denial of his petition was improper.

¶ 74    Because we conclude that the petitioner failed to show that the circuit court misapplied

the *Robinson* standard in assessing the conclusiveness of his newly discovered evidence, we need

not analyze his actual innocence claim under the remaining prongs. See *Sanders*, 2016 IL

118123, ¶ 47.

¶ 75                                III. CONCLUSION

¶ 76    For the aforementioned reasons, we affirm he judgment of the circuit court.

¶ 77    Affirmed.